Matter of Art Inst. of Chicago (2025 NY Slip Op 50617(U))

[*1]

Matter of Art Inst. of Chicago

2025 NY Slip Op 50617(U)

Decided on April 23, 2025

Supreme Court, New York County

Drysdale, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and will not be published in the printed Official Reports.

Decided on April 23, 2025
Supreme Court, New York County

In the Matter of an Application For a Warrant to Search the Premises Located at The Art Institute of Chicago, 111 South Michigan Avenue, Chicago, IL 60603

SMZ-70042-24

For the People:
Assistant District Attorney Matthew Bogdanos, Of Counsel
Assistant District Attorney Edward Smith, Of Counsel
New York County District Attorney's Office 
For the Respondent:
Mr. Edward B. Diskant, Esq., Partner
Ms. Jennifer Levengood, Esq., Associate
McDermott Will & Emery LLP

Althea E.M. Drysdale, J.

"The opposite of art is not ugliness, it's indifference."
 Elie Wiesel
This application concerns the New York County District Attorney's Office Antiquities Trafficking Unit's request for a turnover order for an artwork by Austrian artist Egon Schiele titled Russian War Prisoner, which is currently the subject of a seizure-in-place order and in the physical possession of the Art Institute of Chicago. The application requests that the artwork be returned to the possession of Timothy Reif and David Frankel, co-executors of the estates of Lein Fischer and Milos Vavra, the legally-declared heirs of Franz Fredrich (Fritz) Grünbaum, who owned the painting before his murder by the Nazis at Dachau Concentration Camp during the Holocaust.[FN1]
The Art Institute of Chicago opposes the order, arguing that they are the legal [*2]owners of Russian War Prisoner, as the artwork was legally purchased by them with sufficient evidence detailing the painting's legal sale by Grünbaum's sister-in-law shortly after his murder. For the reasons stated herein, the People's application for a turnover order is granted, and it is ordered that the artwork be relinquished to the legal heirs of its last legitimate owner, Fritz Grünbaum.
Summary of Facts[FN2] 

Actor, librettist, cabaret artist, lawyer, and art collector Franz Fredrich (Fritz) Grünbaum was born on April 7, 1880, in what is now the Czech Republic. He moved to Vienna in 1899 to attend law school before writing his first operetta in 1903 and later transitioned to his longtime employment as the master of ceremonies at numerous cabarets, commencing with the Cabaret Die Holle in Vienna.
Beginning in 1915, Grünbaum served in the Austro-Hungarian Army during World War I. After the war, he returned to his career as an actor in Austria and Germany, eventually becoming the master of ceremonies at the famed Kabarett Simpl in Vienna's Innere Stadt. Grünbaum's legacy as a master of ceremonies lived on long after his death: he was the inspiration for the master of ceremonies character in the critically acclaimed Broadway musical Cabaret as well as the wildly successful 1972 movie adaptation. In 1919, Grünbaum married his third wife, Elisabeth (Lilly) Grünbaum (née Herzl), the eighth daughter of a Viennese goldsmith, and became an Austrian national by marriage. Fritz and Lilly did not have children.
The son of an art dealer, Grünbaum's passion for the arts further expressed itself in his collection of hundreds of paintings, drawings, etchings, and engravings by contemporary Austrian avant-garde artists such as Oskar Kokoschka, Max Oppenheimer, and, especially relevant to this case, Egon Schiele. Schiele, a mentee of Gustav Klimt, was an Austrian Expressionist painter noted for his sketches and watercolor paintings depicting individuals as well as landscapes. Among the dozens of Schiele pieces in Grünbaum's collection was Russian War Prisoner, an opaque watercolor painting over graphite on cream wove paper of an [*3]imprisoned Russian soldier, depicting in detail the head and hand of the subject. The artwork is signed by the artist at the bottom right corner in his hallmark style.
Grünbaum's extensive collection was well-known and well-respected throughout Vienna's art community, being frequently loaned out to public exhibitions. For example, in December of 1925, Grünbaum lent Russian War Prisoner, along with twenty-one other works of art to a solo exhibition hosted by Galerie Würthle. Although not listed by name, the artwork was listed in the program for the exhibition with the description Zeichnungen, Russe, Kopf und Hand, aquarelliert, sign. Egon Schiele 1916 ["Pencil Drawing, Russian, Head and Hand, watercolored, sign. Egon Schiele 1916"], which perfectly matches the image depicted in Russian War Prisoner. Then again, in 1928, Grünbaum lent twenty-five Schiele artworks, Russian War Prisoner included, to gallery owner and established Schiele authority Otto Kallir for the first major posthumous exhibition of Schiele's works. Notably, as part of this transaction, letters show that Kallir travelled to Grünbaum's residence to view Grünbaum's collection in-person and hand-selected the twenty-five pieces, Russian War Prisoner included, for the exhibition. As part of his request to Grünbaum, Kallir created a list of the artworks that he wished to borrow for display. Number fifteen on his list was listed as "Russian Watercolor Pencil, Russian Words, 1916."
As it is relevant to the facts of this case, there is no documentary evidence whatsoever that Grünbaum dispossessed himself of any of his Schiele artworks between their public exhibition in 1928 and Grünbaum's imprisonment by the Nazis in 1938. 
Throughout his storied career, Grünbaum was an outspoken critic of the treatment of Jews in Austria. This advocacy, coupled with his Jewish heritage and his fame within Vienna's performing arts industry, would lead to his capture, imprisonment at Dachau Concentration Camp, and murder at the hands of the Nazis during World War II.
Following Adolf Hitler's rise to power in 1933, Jewish performers were quickly banned from Germany, forcing Grünbaum to relocate and perform exclusively in Austria. However, Grünbaum did not allow the darkening political climate to quell his advocacy: just two days before the German invasion of Austria, following a power outage at Kabarett Simpl, Grünbaum walked out onto the darkened stage and cried, "I see nothing, absolutely nothing! I must have wandered into National Socialist culture!"[FN3]

Hitler believed that the majority of modern art, especially the Expressionist art practiced by Schiele, was reflective of society's moral decline and a result of the genetic inferiority of the artists. The Nazi Party thus identified these works of art as "degenerate" and ordered that they be removed from museums and banned in Nazi-occupied territories.
To further these efforts, the Nazi Party established the Reich Culture Chamber to identify and confiscate artwork that they considered to be "degenerate" in nature. The effort went as far as to create an exhibit in Munich titled "Degenerate Art" with the aim of mocking the artwork and educating the public on the "art of decay." These efforts backfired gloriously when over one million art enthusiasts flocked to view the artwork in only a six-week period. Now realizing the intrinsic value of the artworks that they had stolen, the Nazis proceeded to sell the works they [*4]had deemed "degenerate" to fund the Nazi war efforts.[FN4]

A select few art dealers were tasked by the Reich Chamber for Culture with selling "degenerate" artworks, including the works of Egon Schiele. Among them was art dealer Hildebrand Gurlitt. Throughout the war, Gurlitt confiscated, sold, and destroyed thousands of works of art at the instruction of the Nazis, often taking advantage of his position to pillage the seized artworks to enrich his own collection.
Following the Anschluss [FN5]
on March 12, 1938, Grünbaum and other Jewish artists were immediately banned from performing in Austria. Grünbaum was quickly sought out by the Nazis due to his fame and outspoken criticism of the Nazi Party. Within ten days, he was arrested, detained at the Rossauer Lände Prison in Vienna and subsequently transferred to Dachau Concentration Camp on May 24, 1938. Fellow detainees remember Grünbaum employing his trademark wit and defiance to mock his captors and the conditions that he and other prisoners were subjected to. Simultaneously, his wife Lilly petitioned tirelessly to try and obtain her husband's release, even going as far as to give up her quota number for emigration to the United States as well as an opportunity to flee to Belgium with her sister Mathilde. She refused to leave her beloved behind.
While advocating for her husband's release, Lilly was also forced to comply with the systematic confiscation and seizure of Jewish property by the Nazis. First was the Regulation on the Declaration of Assets of Jews passed by the Nazi Party on April 26, 1938, which required "every Jew" in Germany and Austria to register any property or assets that were valued at more than 5,000 Reichsmarks. Once the property was registered, it was placed in a storage facility operated by the Schenker company, which was, for all intents and purposes, under the complete control of the Nazi Party. To add insult to injury, Jews were required to finance the storage of their belongings in these facilities. When a "customer" failed to pay these storage facilities, or when citizenship was rescinded, or when the owners died or were murdered without heirs, Schenker was authorized to sell the property, either privately or at public auction. The proceeds of these "sales" were then used to fund the Nazi war effort.
Lilly attempted to comply with the regulations by filing her Declaration of Assets on July 15, 1938. The law, however, made no provision for her to file a Declaration of Assets on Fritz's behalf. And so, Lilly requested a deadline extension for Fritz's Declaration of Assets, which was granted on July 27, 1938, to allow Fritz to appoint an authorized representative to file on his behalf.
On July 26, 1938, Dr. Hans Wallner, a notary public in Vienna, signed and executed a document affirming a "true copy of [an] unstamped original" of Fritz Grünbaum's unsigned power of attorney dated July 16, 1938. The document purports to authorize Elizabeth Grünbaum to "submit the statutorily required registration of assets on [Fritz Grünbaum's] behalf and represent [him] in all [his] matters with legal effect." As the People note, however, the "timing of the power of attorney is inconsistent with the contemporaneously recorded facts and developed record":[FN6]
Elisabeth Grünbaum was not notified by the Property Transaction Office to obtain a power of attorney until July 27, 1938, eleven days after Fritz allegedly executed the power of attorney, and one day before the Vienna-based notary public notarized the document. Logic and reason belie the notion that Frtiz could have signed the power of attorney in Dachau, Germany as recorded and that the document could have been signed by a notary public more than 250 miles away in Nazi-controlled Austria only 24 hours later. "To suggest that such a journey was even possible for a Jewish individual in Nazi-controlled territory is to deny Holocaust-era reality."[FN7]
Additionally, although the notary public claims to have had the original document before them at the time the notarization was completed, the original was not attached to the notary form, nor has it ever been produced by any party in the 86 years since it was purportedly signed. Finally, the notary public typed the letters "m.p." after Fritz Grünbaum's typed name, short for manu propria,[FN8]
indicating that it is entirely possible that Grünbaum never truly signed or executed the document.
In the alternative, assuming arguendo that a power of attorney was in fact validly signed and executed by Fritz Grünbaum, there is significant concern as to whether a power of attorney executed by a Jewish man detained in Dachau Concentration Camp awaiting a death order should be considered voluntary as a matter of law. 
Lilly's sister, Mathilde Lukacs, and her brother-in-law, Sigmund Lukacs, also took steps to comply with the regulations by depositing their property with Schenker on June 23, 1938. Among the items deposed were twenty-three framed pictures. On June 27, 1938, Sigmund Lukacs applied for an export permit, listing the artwork with more specificity: 11 oil paintings, 3 watercolor paintings, 3 drawings, and 8 graphic art pieces, 23 of which were framed. The application was approved on August 5, 1938. Seven days later, Mathilde and Sigmund left Vienna via a train to Antwerp, Belgium. The Lukacs' export application, along with a list of the items that had been stored at Schenker since June 23, 1938, was then stamped on August 14, 1938 when the goods passed from the Austrian border and into Germany.
As part of the Grünbaum family's attempts to comply with the regulations, on July 20, 1938, art historian Dr. Franz Kieslinger visited the Grünbaum home in order to inspect and appraise their collection. Despite chronicling 452 separate artworks located in three rooms of the home, Kieslinger valued the collection at only 5,791 Reichsmarks. Kieslinger's inventory also [*5]listed eighty-one Egon Schiele artworks, including five separately-listed oil paintings, a line item for "large hand drawings by Schiele, 55 sheets with colors" and "20 pencil drawings, and 1 etching by Schiele."[FN9]

On August 1, 1938, Lilly submitted Fritz's completed Declaration of Assets and the Kieslinger inventory to the Property Transaction Office. One month later on September 8, 1938, Fritz Grünbaum's art collection was physically removed from the apartment and moved to a Schenker warehouse as part of the export application process. This is documented via the Grünbaum's Schenker Export Permit Request. It should be noted that no records exist that demonstrate that the property was removed from the Schenker warehouse and transported to any other location after that time. 
Less than two months later, on October 31, 1938, Lilly was evicted from the home she had shared with Fritz for more than a decade and forced to move into a much smaller apartment in the nearby Jewish ghetto. Just ten days after her move, Hitler's forces carried out Kristallnacht,[FN10]
burning and destroying hundreds of synagogues and thousands of Jewish-owned businesses throughout Austria and Germany. Two days after Kristallnacht, the Nazi government issued the Decree on the Elimination of the Jews from Economic Life which, in essence, forbade Jews from owning or operating a business of any sort. On December 3, 1938, the Nazi government enacted the Order Concerning the Utilization of Jewish Property, which extinguished the property rights of Jews and appointed trustees to manage all Jewish-owned property on behalf of the Reich. By January 31, 1939, the Reich had appointed Ludwig Rochlitzer, a Viennese lawyer known for enriching himself and his partner by preying upon Jewish residents of Austria and Germany, to oversee the Grünbaum's belongings, including Fritz's art collection.[FN11]

On June 30, 1939, Lilly Grünbaum filed an updated property declaration on behalf of Fritz. The declaration noted a decrease in their assets caused by payments to Rochlitzer for the "services" he provided, as well as payments to the Nazi party to satisfy the Reich Flight Tax and a Jewish Property Levy. [FN12]
 As part of that updated property declaration, Lilly noted that she was paying property storage fees for the property being stored at Schenker. Notably, Grünbaum's entire art collection is included in the declaration at the same valuation made by Kieslinger a year prior. There are no records in relation to the Schenker facility or records from the Nazi government that show the artworks being moved at any point between September 1938 and June of 1939.
Fritz Grünbaum would suffer three years of detainment at multiple concentration camps before succumbing to tuberculosis in 1941. Although fatally ill, Grünbaum performed one last time on New Year's Eve of 1940, just two weeks before his death, proclaiming to his fellow inmates: "I beg of you, Fritz Gru nbaum is not performing for you, but instead it is number [he recited his camp number], who just wants to spread a little happiness on the last day of the year."[FN13]

Lilly's love and devotion to her husband tragically played a role in her demise: following a failed attempt to flee to Shanghai after Fritz's death in 1941, Lilly was arrested and deported to the Maly Trostinets Extermination Camp in what is now Belarus. She was almost certainly murdered by firing squad shortly after her arrival, as was standard practice at the camp. In June 1944, Maly Trostinets was burned to the ground in anticipation of the arrival of the Soviet army, with all surviving prisoners still inside.
Lilly's sister, Mathilde Lukacs, and her husband, Sigmund Lukacs, survived the war. Sigmund was arrested and imprisoned in March of 1938 but released approximately two months later after signing a commitment to leave Austria with Mathilde. The Lukacses were granted authorization to leave the country with their property via train to Antwerp, Belgium. Once in Belgium, they were forced to relocate several times due to the Nazi invasion, eventually being imprisoned in Anderlecht, Belgium until the country was liberated at the end of the war.
On June 16, 1954, Mathilde attempted to have Lilly declared dead by an Austrian court in order to certify her heirship, but subsequently withdrew the application a month later. Five years later in 1959, Mathilde made a claim for restitution on behalf of herself and her sister, listing Lilly's bank assets and jewelry as part of the claim, but ultimately rescinded the [*6]application after the German government requested a certificate confirming her right to inheritance. The Lukacses lived in Belgium until their return to Vienna in 1960. Sigmund died in 1971, and Mathilde in 1979.
Following the end of the war, art dealer Hildebrand Gurlitt's collection was confiscated by the Allied authorities. Even after taking advantage of his affiliation with the Reich Chamber for Culture to pillage Jewish-owned art for his own collection, Gurlitt argued that he himself had been a victim of the Nazi's policies due to his own Jewish heritage. Gurlitt then successfully petitioned to have one hundred and fifteen pieces of art returned to him. Hildebrand Gurlitt died in a car crash in 1956, bequeathing his art collection to his wife and children, including his only son, Cornelius. Cornelius Gurlitt was a known recluse who financed himself by selling off pieces of his father's inherited art collection. Skipping forward to 2012, Cornelius' home was raided by German authorities who recovered more than one thousand five hundred works of art that had been looted by his father Hildebrand during World War II. Following Cornelius Gurlitt's death in 2014, what remained of Hildebrand Gurlitt's art collection was bequeathed to the Museum of Fine Arts in Bern. Since the Gurlitt collection was placed on public display at the museum, many of the artworks were proven to have been looted by the Nazis and returned to their original owners or their heirs.
Another repository for looted art became Galerie Kornfeld, a privately-owned Swiss auction house owned and operated by Eberhard W. Kornfeld. In a 2017 interview, Eberhard Kornfeld admitted that Cornelius Gurlitt was a regular client at Galerie Kornfeld, and that he had personally visited Cornelius' home on multiple occasions to periodically inspect his art collection.
Hildebrand Gurlitt's cousin, Wolfgang Gurlitt, was also an art dealer who was based in Berlin and then in Austria during the war. Like Hildebrand, Wolfgang was known to exploit his position and connections as a curator for the Führermuseum [FN14]
to further his private art collection. In 1946, after the end of the war, Wolfgang entered into an agreement with the city of Linz, Austria, the once-planned location of the Führermuseum, to start a modern-art gallery using works from his private collection. The Neue Galerie der Stadt Linz opened in 1948 and the city of Linz proceeded to purchase most of Wolfgang's private collection between 1953 and 1956. Since acquiring Wolfgang's collection, thirteen of the pieces were determined to have been looted and were subsequently returned to the heirs and/or lawful owners. Among these artworks was an Egon Schiele painting.
Like his cousin Cornelius, Wolfgang Gurlitt was known to sell pieces of his collection to Galerie Kornfeld, including an Egon Schiele pencil drawing with no pre-war provenance. He was a close business associate of Dr. Franz Kieslinger, who had completed the appraisal of Grünbaum's art collection prior to its storage at Schenker during the war.
In 1955 and 1956, Grünbaum's collection of Egon Schiele artworks inexplicably reappeared in the collection of Galerie Kornfeld. It has been determined that, of the 63 Schiele artworks sold by Galerie Kornfeld in 1956, at least 21 were from Grünbaum's pre-war collection, [*7]including the three oil paintings that were specifically named in the inventory created by Franz Kieslinger before the items were transferred to the Schenker in the fall of 1938. Of the 63 Schiele pieces, Kornfeld provided provenance for just one of the pieces of art, listing the prior owner as Fritz Grünbaum. Seventeen of the artworks, Russian War Prisoner included, had been previously listed as part of Grünbaum's art collection as part of the 1925 Würthle exhibition or the 1928 Otto Kallir exhibition. The pieces were sold in a series of sales between 1955 and 1956, leading to the transport of several of the works, Russian War Prisoner included, to New York City. 
Twenty of the 63 Schiele artworks that found their way to Galerie Kornfeld were purchased in 1956 by Otto Kallir for Gallerie St. Etienne, which was then operating on West 57th Street in New York City. After losing his gallery under Hitler's Arayanization laws, Kallir fled first to Switzerland and then to Paris, where he established Galerie St. Etienne. One year later, he and the gallery moved overseas to New York City, where Galerie St. Etienne took up residence on West 57th Street. Kallir's 1956 acquisition of the Schiele artworks from Galerie Kornfeld was not the first time he had the opportunity to view these artworks in person: of the twenty artworks he purchased, Kallir had hand-selected nine of these artworks from Fritz Grünbaum's collection in 1928, when Grünbaum allowed Kallir to borrow the artworks for his 1928 exhibition. Three others were exhibited at Galerie Würthle in 1925, where Kallir was employed before opening Neue Galerie.
Kallir's affinity for Austrian Expressionist art travelled with him to New York, where he hosted many of the first exhibitions featuring important artists from the Expressionist movement, including the first Egon Schiele solo exhibition in the United States. Kallir's exhibitions served their purpose in elevating the worth of the pieces on display at Galerie St. Etienne.
When deposed in 2007 regarding sales conducted between Kornfeld and Kallir, Kornfeld testified that, at the time of the sale of Russian War Prisoner, he and Otto Kallir never discussed the provenance or the pre-war history of the pieces that were being sold and purchased.[FN15]

Once Kallir received Russian War Prisoner at his New York City gallery on October 23, 1956, he placed the artwork on exhibition at Galerie St. Etienne until it was purchased by Connecticut-based art dealer David Kimball. Kimball then sold the artwork to Louisiana gallery owner Leo Askew, who in turn sold Russian War Prisoner to B.C. Holland in Chicago. On July 28, 1966, B.C. Holland sold Russian War Prisoner to the Art Institute of Chicago, where it has remained since its purchase. Acquisition worksheets completed in 1966 and provided by the Art Institute of Chicago are devoid of any inquiry or notations regarding the provenance of the piece.
In 2002, as part of a project to research art "with wartime provenance gaps," the Art Institute of Chicago had an intern contact Eberhard Kornfeld via fax to inquire as to the ownership history of Russian War Prisoner. Kornfeld responded shortly after, stating that the artwork originated from Grünbaum's collection, which he purchased from Mathilde Lukacs, Grünbaum's sister-in-law. Kornfeld claimed that Grünbaum's collection was never seized by Nazi authorities and that instead Mathilde kept the collection until she sold several pieces in 1955 and others on subsequent dates. This Court has not been provided any evidence of further provenance research conducted by the Art Institute of Chicago in relation to Russian War Prisoner between the time of its purchase and the instant action.
National and International Notices Regarding Nazi Looted Art
Determining true ownership of Nazi-looted art is a demonstrably complex process, due largely in part to the passage of time, the fact that the thefts occurred during times of war, the multiple transfers of ownership following their seizure, and the unavailability of records documenting their movement over time.
"[T]he displacement of art during World War II was unprecedented. Never before had there been such a massive amount of artwork removed from so many countries during wartime: millions of artistic objects of every description were systematically confiscated. The seizing of art work from Jewish collections all over Europe and Asia was part of a process of persecution, dehumanization and eventual annihilation."[FN16]
Throughout the course of World War II, the Nazis looted an estimated 150,000 pieces of art from Western Europe and another 500,000 artworks [*8]from countries within Eastern Europe,[FN17]
equating to "approximately one-fifth of all Western European art then in existence."[FN18]
After only twelve years in power, the Nazi Party either displaced, stole, or transported as much art as was misappropriated during the entire Thirty Years War or all the Napoleonic Wars.[FN19]
In total, the Nazis plundered an estimated $2.5 billion (today's value: $20.5 billion) worth of artworks which were then either sold to finance the war effort, further plundered by Nazi officials, or stored for intended future display at the Fürhermuseum.[FN20]
 "While at times the Nazis committed a forceful and physical seizure of artwork, there were also instances of much more subtle duress. This indirect coercion led families to believe their choice was to either lose everything and be killed or give up everything to try to survive. As a result, many families sold their artwork and liquidated their assets in order to escape the Third Reich and flee Europe."[FN21]
"Outright confiscation of privately-owned artwork started in Austria following the Anschluss in March 1938, where Vienna served as the 'crucial testing ground' for the Nazi's looting program. In the wake of the anti-Semitic violence of Kristallnacht, in November 1938, 'Aryanization' intensified and confiscation started in Germany. The earlier decrees that required Jews to register their personal property with the government supplied the Nazis with lists of artwork to expropriate."[FN22]

Towards the end of the war, the Allied forces undertook swift and diligent efforts to locate these artworks and safeguard them for the purposes of reunifying them with their original owners, whether they be countries, institutions, or individuals. While the Allied Forces located caches of priceless artwork stashed in churches and even in mineral mines thousands of feet below the ground, museums, activists, and lawmakers around the world circulated warnings regarding wartime artwork with questionable provenance, emphasizing the need to investigate [*9]and determine whether the artwork was looted.
Despite their efforts, many artworks were not immediately recovered and returned to their owners at the end of the war. In fact, many of the artworks would not reappear on the open markets for close to a decade. This was due to the international ban on the purchase and sale of artwork believed to have been looted and stolen throughout the course of the war, with the aim of providing governments, public museums, private institutions, survivors and their heirs the opportunity to come forward and claim their stolen property.
Between the years of 1952 and 1957, the international art community experienced a flood of artwork to the market, owing in part to the expiration of the aforementioned period of banned sales. As explained in further detail below, a series of national and international notices, conferences, treaties and referendums on the part of nations as well as private institutions aimed to identify these artworks, research their provenance and, when appropriate, return said artworks to their true owners and heirs.
1941: The Monuments Men and "The Greatest Treasure Hunt in History"
After the attack on Pearl Harbor in 1941, art enthusiasts and historians began to discuss how to protect and salvage the world's most important cultural monuments in the face of the Second World War.[FN23]
From their discussions evolved the American Commission for the Protection and Salvage of Artistic and Historic Monuments in War Areas, known for short as the Roberts Commission.[FN24]
The Commission was responsible for protecting Europe's cultural treasures and recovering artworks from the Nazis that had been stolen from public and private institutions as well as from the personal collection of Jews living in Nazi-occupied territories.[FN25]
The unit was aided by its intelligence counterpart, the Art Looting Investigation Unit (ALIU), which was responsible for locating, investigating, cataloging and repatriating the stolen art.[FN26]
Collectively, these units uncovered over 1,400 repositories in churches, mines, castles, barns, and monasteries in which millions of items were hidden.[FN27]
As a result of their efforts, millions of priceless works of art were returned to their rightful owners and/or their heirs.[FN28]

[*10]1943: Warning by the United States Department of State
On January 9, 1943, the United States Department of State, along with South Africa, Australia, Belgium, Canada, China, the Czech Republic, the United Kingdom, the Union of Soviet Socialist Republics, Greece, India, Luxembourg, the Netherlands, New Zealand, Norway, Poland, Yugoslavia and the French National Committee, issued a bulletin meant to serve as a "formal warning to all concerned, and in particular to persons in neutral countries, that they intend[ed] to do their utmost to defeat methods of dispossession practiced by the governments with which they [were] at war"[FN29]
and warning those concerned that the countries issuing the bulletin "reserve[d] all their rights to declare invalid any transfers of, or dealings with, property; rights and interests of any description whatsoever which [were], or ha[d] been situated in the territories which ha[d] come under the occupation or control, direct or indirect, of the governments in which they [were] at war or which ha[d] belonged, to persons, including juridical persons, resident in such territories."[FN30]
The bulletin further cautioned that the warning applied regardless of "whether such transfers or dealings ha[d] taken the form of open looting or plunder, or of transactions apparently legal in form, even when they purport[ed] to be voluntarily effected."[FN31]

1945: Roberts Commission Letter to Museums, Art and Antique Dealers, and Auction Houses [FN32]

In 1945, the Roberts Commission penned an advisory letter to museums, art dealers and auction houses throughout the United States. The Commission reported numerous instances of objects of questionable provenance being offered to museums. It further requested that these institutions make the Commission aware of any instances "[w]here the source or origin of these objects may be obscure or suspicious and where the objects may be of special artistic importance." The Commission warned art collectors that "[i]t is, of course, obvious that no clear title can be passed on objects that have been looted from public or private collections abroad" and that "it [was] to the advantage of both public institutions and the trade [ . . . ] that any specific examples of looting of works of art or cultural materials be brought to light as soon as possible."
1947: Department of State Memorandum "Return of Looted Objects of Art to Countries [*11]of Origin"[FN33]

Just two years later in 1947, the State Department Member of the State-War-Navy Coordinating Committee issued a memorandum titled "Return of Looted Objects of Art to Countries of Origin," stating that it was incumbent on the United States government to "exert every reasonable effort to right such wrongs as may be brought to light." The memorandum instructed the Department of State to send the missive to all "museums, libraries, university departments of fine arts, art and antiquities dealers and auction houses and booksellers" with the request that "recipients of the circular be vigilant to note objects in that category, when feasible to invite deposit of such objects pending settlement, and notify the Department of State immediately of any obtainable information concerning such objects."
The memorandum was accompanied by a "List of Dealers and Museums to Whom Enclosed Memorandum Concerning Art Objects of Questionable Origin has Been Sent" listing the Art Institute of Chicago as number eighteen of the sixty-four museums to whom the memorandum was issued.
1948: United States Supreme Allied Commander's Law No. 52 [FN34]

Just one year later in April of 1948, as part of the Denazification effort, the United States issued Supreme Allied Commander's Law No. 52 which governed property misappropriated during the war: 
Property which has been the subject of duress, wrongful acts of confiscation, dispossession or spoilation from territories outside Germany, whether pursuant to legislation or by procedures purporting to follow forms of law or otherwise, is hereby declared to be equally subject to seizure of possession or title, direction, management, supervision, or otherwise being taken into control by Military Government.[FN35]
The law prohibited the import, acquisition or receipt, dealing, selling, leasing, transfer, export, hypothecation or other disposal, destruction, surrender of possession, custody or control of any property "which is a work of art or cultural material of value or importance, regardless of the ownership or control thereof."[FN36]
All custodians, curators, or other persons having possession, custody, or control of property enumerated by the law were required to hold, preserve and safeguard the property and transfer the property to the Military Government when directed to do so. Finally, the law instructed that "any prohibited transaction on effected without a duly issued license or authorization from Military Government, and any transfer, contract, or other [*12]arrangement made, whether before or after the effective date of this law, with intent to defeat or evade this law or the powers or objects of Military Government or the restitution of any property to its rightful owner, is null and void," and warned that "any person violating any of the provisions of this law shall, upon conviction by a Military Government Court, be liable to any lawful punishment, including death, as the Court may determine."[FN37]

1950: United States Department of State Letter to Universities, Museums, Art Dealers and Booksellers [FN38]

Again in 1950, the Department of State sent a letter to universities, museums, art dealers and booksellers regarding artworks that had been misappropriated during the war. The letter stated that it was the "responsibility and desire of the Government of the United States to recover and return to owner nations those cultural objects, including works of art [ . . . ] [that were] looted, stolen or improperly dispersed from public and private collections in war areas and brought to the United States during and following World War II."[FN39]
The letter further stated that a number of museums and other institutions had heeded prior warnings from the United States government regarding this issue and that the efforts had "led to the recovery [ . . . ] of a number of items of artistic and historic importance," and stressed that "[t]he continued vigilance of American institutions and individuals in identifying cultural objects improperly dispersed during World War II is needed."[FN40]

This letter was accompanied by a list of over 550 institutions to whom the missive was sent. Again, the Art Institute of Chicago was among the list of recipients. The letter was further reproduced and distributed via the February 1951 Magazine of Art and the Winter 1950 College Art Journal.
1954: The Hague Convention for the Protection of Cultural Property
The Hague Convention for the Protection of Cultural Property in the Event of Armed Conflict of 1954 signified the first international attempt following World War II to implement laws primarily for the protection of cultural property stolen during wartime. The commitments made by the member states to the convention aimed to protect cultural property by (i) adopting preventative measures such as inventories of cultural property and emergency measures to protect said property during wartime, (ii) developing agreements that guarantee respect for cultural property during times of armed conflict, (iii) providing designated shelter locations for movable cultural property, (iv) establishing special units within military forces to ensure the protection of cultural property (similar to the role of the Monuments Men during World War II), [*13](v) permitting sanctions in the event that the terms of the Convention are breached, and (vi) promoting the aims of the Convention to the general public and through targeted professional organizations such as cultural heritage experts, militaries, and law enforcement agencies.[FN41]

1970: UNESCO Convention on the Means of Prohibiting and Preventing the Illicit Import, Export and Transfer of Ownership of Cultural Property
The Convention on the Means of Prohibiting and Preventing the Illicit Import, Export and Transfer of Ownership of Cultural Property of 1970 is an international treaty ratified by 143 states designed to prevent the illicit trafficking of cultural property. The treaty provides a framework for the measures to be taken to "prohibit and prevent the import, export and transfer of cultural property."[FN42]
The ratifying states were encouraged to (i) establish national inventories for cultural property, (ii) adopt codes of conduct for dealers in cultural property, (iii) encourage educational programs to develop respect for cultural property, (iv) oversee the movement of cultural property through export certificates and prohibitions on imports and exports without certificates, (v) encourage the imposition of penal sanctions on individuals contravening the aforementioned prohibitions, (vi) promote emergency export bans in countries that are seriously endangered by intense looting of archaeological and ethnological artifacts, and (vii) seize and return stolen property to its state of origin when appropriate.[FN43]

1975: UN General Assembly Resolution 3391(XXX) of 19 November 1975: Restitution of Works of Art to Countries, Victims of Expropriation
In 1975, the United Nations General Assembly issued Resolution 3391. This required the restitution of works of art to countries and victims of expropriation. As part of the resolution, the United Nations affirmed that "prompt restitution to a country of its objets d'art, monuments, museum pieces, and manuscripts by another country, without charge, is calculated to strengthen international co-operation inasmuch as it constitutes just reparation for damage done."[FN44]
The [*14]resolution urges member states to protect and safeguard misappropriated artworks within their territories. Further, the assembly called upon members states "which have not already done so to proceed to the restitution of objets d'art, monuments, museum pieces, manuscripts and documents to their countries of origin [ . . . ]."[FN45]

1986: International Council of Museums ("ICOM") Code of Ethics
In 1986, the International Counsel of Museums ("ICOM") promulgated their Code of Ethics for member museums, addressing "diverse museum-related topics such as acquisition procedures, compliance with legislation, management of resources, security, returns and restitutions. The Code advocates strong principles playing a key role in the fight against illicit traffic, for instance concerning due diligence and provenance."[FN46]
The ICOM Code of Ethics "sets minimum professional standards and encourages the recognition of values shared by the international museum community" and was "conceived as an instrument of professional self-control."[FN47]
Per their internal guidelines, "ICOM members must accept and comply with the Code's rules."[FN48]

1998: American Association of Museum Directors ("AAMD") Task Force on the Spoilation of Art during the Nazi/World War II Era (1933-1945)
In June of 1998, the American Association of Museum Directors ("AAMD") issued their Report of the AAMD Task Force on the Spoilation of Art during the Nazi/World War II Era (1933-1945). This report was issued in furtherance of AAMD's aim to "aid its members in establishing and maintaining the highest professional standards."[FN49]
The report "recognize[d] and deplore[d] the unlawful confiscation of art that constituted one of the many horrors of the Holocaust and World War II" and "reaffirm[ed] the commitment of its members to weigh, [*15]promptly and thoroughly, claims of title to specific works in their collections."[FN50]

The report enumerated a set of guidelines for member museums to follow. The guidelines created a framework to assist museums in "resolving claims, reconciling the interests of individuals who were dispossessed of works of art or their heirs together with the fiduciary and legal obligations and responsibilities of art museums and their trustees to the public."[FN51]
Specifically, the guidelines put forth policies for member museums to follow:
1. As part of the standard research on each work of art in their collections, members of the AAMD, if they have not already done so, should begin immediately to review the provenance of works in their collections to attempt to ascertain whether any were unlawfully confiscated during the Nazi/World War II era and never restituted.
2. Member museums should search their own records thoroughly and, in addition, should take all reasonable steps to contact established archives, databases, art dealers, auction houses, donors, art historians and other scholars and researchers who may be able to provide Nazi/World-War-II-era provenance information.[FN52]
The AAMD report further promulgates guidelines that museums should follow in the event that an artwork within their possession was unlawfully looted or confiscated from its prior owners:
1. If a member museum should determine that a work of art in its collection was illegally confiscated during the Nazi/World War II era and not restituted, the museum should make such information public.
2. In the event that a legitimate claimant comes forward, the museum should offer to resolve the matter in an equitable, appropriate, and mutually agreeable manner.
3. In the event that no legitimate claimant comes forward, the museum should acknowledge the history of the work of art on labels and publications referring to such a work.[FN53]
Finally, the AAMD report provides a framework for museums to use when responding to a claim to alleged Nazi-looted art:
1. If a member museum receives a claim against a work of art in its collection related to an illegal confiscation during the Nazi/World War II era, it should seek to review such a claim promptly and thoroughly. The museum should request evidence of ownership from the claimant in order to assist in determining the provenance of the work of art.
2. If after working with the claimant to determine the provenance, a member museum [*16]should determine that a work of art in its collection was illegally confiscated during the Nazi/World War II era and not restituted, the museum should offer to resolve the matter in an equitable, appropriate, and mutually agreeable manner.
3. The AAMD recommends that member museums consider using mediation wherever reasonably practical to help resolve claims regarding art illegally confiscated during the Nazi/World War II era and not restituted.[FN54]
An April 2001 addendum to the AAMD report recognized efforts on behalf of American museums "committed to continuing provenance research on works in their collections and disseminating the information obtained" in response to the December 15, 2000 Presidential Advisory Commission on Holocaust Assets in the United States.[FN55]

1998: Washington Conference Principles on Nazi Confiscated Art
In 1998, representatives from 44 countries and 13 non-governmental organizations, including representatives from art museums and auction houses, convened for a symposium in Washington, D.C. The ramifications of Nazi-looted art and the impact that the loss of Holocaust-era stolen assets had on the Jewish community as a whole were discussed. From this conference emerged the Washington Conference Principles on Nazi Confiscated Art, a "consensus of non-binding principles to assist in resolving issues relating to Nazi-confiscated art."[FN56]
The Principles focused on methods to accurately identify artifacts that were likely looted by the Nazis and put forth suggested methods to resolve ownership issues within each country's legal framework:
"Art that had been confiscated by the Nazis and not subsequently restituted should be identified. [ . . . ] In establishing that a work of art had been confiscated by the Nazis and not subsequently restituted, consideration should be given to unavoidable gaps or ambiguities in the provenance in light of the passage of time and the circumstances of the Holocaust era. [ . . . ] Pre-War owners and their heirs should be encouraged to come forward and make known their claims to art that was confiscated by the Nazis and not subsequently restituted. If the pre-War owners of art that is found to have been confiscated by the Nazis and not subsequently restituted, or their heirs, can be identified, steps should be taken expeditiously to achieve a just and fair solution, recognizing this may vary according to the facts and circumstances surrounding a specific case."[FN57]
1998: Holocaust Victims Redress Act (Public Law 105-158, 112 Stat. 15)
In 1998, the United States Congress enacted the U.S. Holocaust Assets Commission Act, which was intended to compensate Holocaust victims who did not receive adequate restitution for assets taken by the United States during World War II. The Act "[e]xpresses the sense of the Congress that, consistent with the 1907 Hague Convention, all governments should undertake good faith efforts to facilitate the return of private and public property, such as works of art, to the rightful owners in cases where assets were confiscated from the claimant during the period of Nazi rule and there is reasonable proof that the claimant is the rightful owner."[FN58]

2001 American Alliance of Museums Guide to Provenance Research
In 2001, the American Alliance of Museums published The AAM Guide to Provenance Research. This was a comprehensive guide for tracing the ownership history of works of art, with a particular focus on cultural property looted by the Nazis during World War II. The manual provides instruction on basic provenance research and principles, Holocaust provenance research, and appendices which include "bibliographies of collections, dealer archives, and 'red flag names' compiled by the Office of Strategic Services."[FN59]
The guide acknowledges that, beginning in "1933 through the end of World War II in 1945, the Nazi regime orchestrated a system of theft, confiscation, coercive transfer, looting, pillage, and destruction of objects of art and other cultural property in Europe on a massive and unprecedented scale."[FN60]
It further promises that the American museum community is committed to "continually identifying and implementing the highest standard of legal and ethical practices" and "recognizes that the atrocities of the Nazi era demand that [the American Alliance of Museums] specifically address this topic in an effort to guide American museums as they strive to achieve excellence in ethical museum practice."[FN61]
"The Alliance's Code of Ethics for Museums states that the 'stewardship of collections entails the highest public trust and carries with it the presumption of rightful ownership, permanence, care, documentation, accessibility, and responsible disposal.'"[FN62]
In that [*17]vein, AAM concludes that, "[w]hen faced with the possibility that an object in a museum's custody might have been unlawfully appropriated as part of the abhorrent practices of the Nazi regime, the museum's responsibility to practice ethical stewardship is paramount," and further directs its member museums to "develop and implement policies and practices that address this issue in accordance with these guidelines."[FN63]
Specifically, AAM directs its member organizations to:
(1) Identify all objects in their collections that were created before 1946 and acquired by the museum after 1932, that underwent a change of ownership between 1932 and 1946, and that were or might reasonably be thought to have been in continental Europe between those dates;
(2) Make currently available object and provenance (history of ownership) information on those objects accessible; and
(3) Give priority to continuing provenance research as resources allow.[FN64]
In relation to existing collections, the AAM directs museums to "make serious efforts to allocate time and funding to conduct research on covered objects whose provenance is incomplete or uncertain."[FN65]
This includes, among other suggestions:
• Reviewing objects in their collection "to identify those whose characteristics or provenance suggest that research be conducted to determine whether they may have been unlawfully appropriated during the Nazi era without subsequent restitution;"[FN66]
• Undertaking provenance research within their own records and through contacting "established archives, databases, art dealers, auction houses, donors, scholars, and researchers who may be able to provide Nazi-era provenance information;"[FN67]
• Incorporating Nazi-era provenance research into their standard research on collections; and
• Documenting their research into the Nazi-era provenance of objects in their collections.
If a museum were to discover credible evidence of unlawful appropriation of one of their artworks, the AAM suggests that the affected museum "take prudent and necessary steps to resolve the status of the object, in consultation with qualified legal counsel," and to make such [*18]information public.[FN68]
In situations where a party makes a claim of ownership of an alleged Nazi-looted artwork, the AAM states that the affected museum should address the claim "openly, seriously, responsively, and with respect for the dignity of all parties involved."[FN69]
It specifically directs museums to promptly and thoroughly review claims that an object in their collection was unlawfully appropriated during the Nazi era without subsequent restitution, and request evidence of ownership from the claimant in order to assist in determining provenance. "If a museum determines that an object in its collection was unlawfully appropriated during the Nazi era without subsequent restitution, the museum should seek to resolve the matter with the claimant in an equitable, appropriate and mutually agreeable manner. [ . . . ] When appropriate and reasonably practical, museums should seek methods other than litigation (such as mediation) to resolve claims that an object was unlawfully appropriated during the Nazi era without subsequent restitution."[FN70]

2006: "Nazi-Era Stolen Art and U.S. Museums: A Survey of U.S. Museums Concerning Adherence to the Washington Conference Principles on Nazi-Confiscated Art and the Procedures and Guidelines Recommended by the American Association of Museums Regarding Objects Transferred in Europe During the Nazi Era"
In addition to the aforementioned notices, the Art Institute of Chicago has also received direct interrogatories from interest groups in regards to their provenance practices relating to Nazi-looted art. For example, a 2006 survey titled "Nazi-Era Stolen Art and U.S. Museums: A Survey of U.S. Museums Concerning Adherence to the Washington Conference Principles on Nazi-Confiscated Art and the Procedures and Guidelines Recommended by the American Association of Museums Regarding Objects Transferred in Europe During the Nazi Era," jointly compiled by the Conference on Jewish Material Claims Against Germany and the World Jewish Restitution Organization, the Art Institute of Chicago affirmatively responded to the survey organizers stating that they either "employ, will employ, or have previously employed a provenance researcher."[FN71]
The survey further indicated that the Art Institute of Chicago admitted [*19]that they had faced or were currently facing a claim of possession of Nazi-looted art against their museum.[FN72]

2009: Holocaust Era Assets Conference in Prague, Czech Republic and the Terezin Declaration
The United States reinforced its commitment to recovering Nazi-looted art in 2009 through its participation in the Prague Holocaust Era Assets Conference. The conference brought together 46 nations in Terezin, the former home to Theresienstadt Concentration Camp where thousands of Jews were murdered by the Nazis. Discussions focused on the welfare of the aging Holocaust survivors, with renewed efforts to reunite survivors with their lost artworks before they passed away. The gathered states "recogniz[ed] that despite [achievements to date], there remain[ed] substantial issues to be addressed, because only a part of the confiscated property ha[d] been recovered or compensated."[FN73]
Therefore, referendums were issued to strengthen and continue efforts to return looted artwork to its original owners:
"Noting the importance of restituting communal and individual immovable property that belonged to the victims of the Holocaust (Shoah) and other victims of Nazi persecution, the Participating States urge that every effort be made to rectify the consequences of wrongful property seizures, such as confiscations, forced sales and sales under duress of property, which were part of the persecution of these innocent people and groups, the vast majority of whom died heirless.
"Recognizing the progress that has been made in research, identification, and restitution of cultural property by governmental and non-governmental institutions in some states since the 1998 Washington Conference on Holocaust-Era Assets and the endorsement of the Washington Conference Principles on Nazi-Confiscated Art, the Participating States affirm an urgent need to strengthen and sustain these efforts in order to ensure just and fair solutions regarding cultural property, including Judaica that was looted or displaced during or as a result of the Holocaust (Shoah)."[FN74]
2016: Holocaust Expropriated Art Recovery Act
Again in 2016, the United States Government issued further guidance in an attempt to reunify Nazi-looted art with its original owners through the Holocaust Expropriated Art Recovery Act, referred to in short as the "HEAR Act." The Act began by acknowledging that, throughout the course of World War II, the Nazis stole, confiscated, or otherwise misappropriated hundreds of thousands of pieces of art throughout Europe as part of their genocidal campaign against the Jews. This amounted to the "greatest displacement of art in human history."[FN75]
The Act further notes that victims of Nazi persecution and their heirs have filed legal actions in order to recover Nazi-looted art, but that those attempts often faced "significant procedural obstacles partly due to State statutes of limitations,"[FN76]
which, in some cases, meant that their claims were procedurally barred before World War II even ended:
The unique and horrific circumstances of World War II and the Holocaust make statutes of limitations especially burdensome to the victims and their heirs. Those seeking recovery of Nazi-confiscated art must painstakingly piece together their cases from a fragmentary historical record ravaged by persecution, war, and genocide. This costly process often cannot be done within the time constraints imposed by existing law.[FN77]
Due to the significant fact-finding efforts that often accompanied efforts to recover Nazi-looted art, in the face of strict statutes of limitations, the government decided that "the enactment of a Federal law [was] necessary to ensure that claims to Nazi-confiscated artworks are adjudicated in accordance with United States policy as expressed in the Washington Conference Principles on Nazi-Confiscated Art, the Holocaust Victims Redress Act, and the Terezin Declaration."[FN78]
Therefore, the government enacted legislation that held that "a civil claim or cause of action against a defendant to recover any artwork or other property that was lost during the covered period because of Nazi persecution may be commenced not later than 6 years after the actual discovery by the claimant" or an agent thereof of (1) the identity and location of the artwork and (2) a possessory interest of the claimant in the artwork."[FN79]

March 2024: 25th Anniversary Best Practices for the Washington Conference Principles on Nazi-Confiscated Art
In honor of the 25th anniversary of the Washington Conference on Holocaust-Era Assets, [*20]in March of 2024 the United States Department of State Special Envoy for Holocaust Issues released a memorandum of best practices to "clarify and improve the practical implementation" of the Conference principles. Especially relevant to this specific circumstance, the Best Practices confirmed that the terms "Nazi-confiscated" and "Nazi-looted" referred to artwork that was "looted, confiscated, sequestered, and spoliated by the Nazis [ . . . ] through various means including but not limited to theft, coercion, and confiscation, and on grounds of relinquishment, as well as forced sales and sales under duress during the Holocaust era between 1933-45."[FN80]
The memorandum encouraged governments to conduct "provenance research and projects to catalogue, digitize and make available on the internet public and private archives, including dealer records" and encouraged public and private collections to publish their inventories in an effort to locate lost works.[FN81]
Countries were to "consider making exceptions to barriers such as regulations against deaccessioning from state collections, statutes of limitations, market overt, usucapion (mode of acquiring title to property by uninterrupted possession of it for a definite period), good faith acquisition, and export bans."[FN82]
The memorandum was endorsed by 28 countries.
Legal Analysis
In order to determine who is entitled to ownership of Russian War Prisoner, this Court must make several findings. First, the Court must determine whether Russian War Prisoner constitutes "stolen property" under New York Law. Next, the Court must determine whether New York County Supreme Court has jurisdiction over the artwork. If the Court determines that jurisdiction does exist, the Court must next determine whether the application is time-barred. If the application is not time-barred, the Court must evaluate whether New York State Criminal Procedure Law § 450.10, which provides for the return of stolen property to its owners, is the appropriate mechanism for the relief requested in this case.
I. Does Russian War Prisoner Constitute Stolen Property Under New York Law?
Pursuant to New York State Law, property is considered to be stolen whenever a person "wrongfully takes, obtains, or withholds the property from an owner thereof." PL § 155.05(1). An "owner" of property is defined as "any person who has a right to possession thereof superior to that of the taker, obtainer, or withholder." PL § 155.00(5). "New York case law has long protected the right of the owner whose property has been stolen to recover that property, even if it's in the possession of a good-faith purchaser for value." Solomon R. Guggenheim Found. v. [*21]Lubell, 77 NY2d 311, 317 (1991). See also Bakalar v. Vavra, 619 F.3d 136, 140 (2d Cir. 2010) ("in New York, a thief cannot pass good title"), aff'd, 500 F. Appx. 6 (2d Cir. 2012).
To determine whether Russian War Prisoner constitutes stolen property for the purposes of the statute, the Court must inherently decide whether or not Russian War Prisoner was stolen.
This Court finds that it was.
The parties do not dispute that, prior to World War II, Grünbaum was the lawful owner of Russian War Prisoner. It is well documented that Grünbaum publicly exhibited the artwork not once, but twice, prior to the start of World War II. Neither party has argued nor proffered any evidence that Grünbaum dispossessed himself of Russian War Prisoner at any time before the start of the war. In fact, Kieslinger's July 20, 1938 appraisal and inventory of Grünbaum's art collection serves to confirm that he did not.
Therefore, Russian War Prisoner was considered "stolen" when it was placed in the Nazi-controlled Schenker storage facility on September 8, 1938, as Grünbaum no longer exercised "dominion and control" over the artwork. In fact, there is an argument to be made that Grünbaum lost dominion and control over the artwork as early as July 20, 1938, when Kieslinger's inventory was compiled for the express purpose of moving the belongings to the Nazi-controlled storage facility. At the very latest, the artwork would have been considered stolen in December of 1938, when the Nazis appointed an Aryan trustee to oversee Grünbaum's belongings.
The law of this state is well settled: "[I]n New York, a thief cannot pass good title." Bakalar v. Vavra, 619 F.3d at 140 (2d Cir. 2010). The fact that Russian War Prisoner was stolen by a government during wartime does not change the analysis. In re Flamenbaum, 22 NY3d 962, 966 (2013) ("We decline to adopt any doctrine that would establish good title based upon the looting and removal of cultural objects during wartime by a conquering military force.") Therefore, the artwork was "stolen property" when it was obtained by Kornfeld, when it was sold by Kornfeld to Kallir, and continued to be considered "stolen property" for the entirety of the time it was within New York State before being sold to the next purchaser. No number of subsequent sales could render the purchase legitimate: Russian War Prisoner, no matter how many well-intentioned "owners" it may have had, has been "stolen property" for the last eighty-six years. See, e.g. Solomon R. Guggenheim Found. v. Lubell, 77 NY2d at 317 ("New York case law has long protected the right of the owner whose property has been stolen to recover that property, even if it is in the possession of a good-faith purchaser for value.")
Russian War Prisoner clearly constituted "stolen property" for the entirety of the time that it was within New York County. Kornfeld did not have proper title to Russian War Prisoner when he sold the artwork to Kallir in 1956. Therefore, Russian War Prisoner was "stolen property" from the time it arrived in New York County, for the entirety of the time it was displayed at Galerie St. Etienne, for the entirety of the time it was exhibited along with other Schiele works within New York County, and at the time it was sold by Kallir to Connecticut-based art dealer David Kimball, thus moving the painting outside of New York County.
In their defense, the Art Institute of Chicago posits that the Grünbaums willfully provided Russian War Prisoner to Lilly's sister, Mathilde Lukacs, who in turn legally sold the painting to Kornfeld. This would mean that all subsequent purchases of the artwork, including the Art Institute of Chicago's acquisition of Russian War Prisoner in 1966, would have been with clean title. In order for this argument to prevail, the Art Institute of Chicago must show, by [*22]a preponderance of the evidence, that Mathilde Lukacs acquired proper title over Russian War Prisoner and legally sold the painting to Kornfeld. First and foremost, an examination of the research compiled by the parties over the past several decades demonstrates that it is highly improbable that Mathilde Lukacs ever obtained proper title of Russian War Prisoner and subsequently sold the work to Kornfeld. Additionally, prior decisions by Courts on the state, federal, and international level belie that claim.
The facts surrounding Kornfeld's initial claim that he received Grünbaum's Schiele paintings from Mathilde Lukacs immediately cast doubt upon their veracity. Between 1938 and 1955, Eberhard Kornfeld and his gallery did not sell a single Schiele painting. Then, in 1955 and 1956, his auction house Gutekunst & Klipstein sold 63 Schiele paintings and drawings. Of the 63 artworks, Kornfeld provided prior ownership information for one: Tote Stadt I [Dead City I], previously owned by none other than Fritz Grünbaum. Circumstantial evidence suggests that several other Schiele artworks that found their way into Kornfeld's possession were also owned by Grünbaum prior to World War II.[FN83]

Kornfeld's invoice for the sale of Russian War Prisoner to Kallir listed the artwork as Number 39, with the description "36765 Bildnis eines gefangenen Russen" [Portrait of a captured Russian] Fr. 700." The People assert that the "36765" purports to be an inventory number for the artwork, as it was Kornfeld's practice to assign each piece of art a 5-character inventory number beginning with a "36."[FN84]
But in the August 1955 typed summary reflecting Kornfeld's receipt of the first eight Schiele drawings, Kornfeld didn't use the five-character inventory numbers. Instead, he typed the numbers 102-109, which corresponds to the numbers assigned to the artworks in the November 1955 auction catalogue. However, the catalogue, and the itemized listings therein, had yet to exist. Additionally, the November 11, 1955 ledger claims to be an accurate typed summary of the actual handwritten ledger, which has never been provided. Twelve of the sixteen artworks contain the word Austellung 1956, which are in reference to the catalogue numbers created for an exhibition that wouldn't exist for another ten months.
Kornfeld first asserted the existence of this purported invoice in 1998, 34 years after the sale took place. The invoices were produced in response to Swiss journalist Thomas Buomberger's article and subsequent book "Raubkunst, Kunstraub: Die Schweiz und der Handel mit gestohlenen Kulturgütern zur Zeit des Zweiten Weltkriegs" [Stolen Art — Art Theft: Switzerland and the Trade in Stolen Cultural Assets at the Time of the Second World War], which chronicled Switzerland's complicity in laundering Nazi-looted art during and after the [*23]war. Buomberger's findings centered around the steep increase in the number of artworks exported from Switzerland beginning in 1948 and continuing for decades after, noting that "a considerable amount arrived in Switzerland during the war years, most of it illegally, simply for temporary storage here. After the war, South America and the USA became attractive sales markets."[FN85]
As part of his article, Buomberger interviewed and analyzed Kornfeld's actions in relation to this trend, seeing as his gallery, located in Switzerland, had sold 7,176 pieces of art between 1952 and 1957 when Nazi-looted art flooded the market.
In response to the claims made within the article, Kornfeld claimed for the first time that the artworks had been provided to him by Mathilde Lukacs. To validate that claim, Kornfeld produced the aforementioned typewritten invoices detailing the acquisition of the artworks from Lukacs on four occasions between August of 1955 and April of 1956. The so-called evidentiary proof provided by Kornfeld to give credence to these assertions instead provides additional cause for speculation. The People submit that each of the ledgers reveals tell-tale signs of reverse-engineering that suggest that the ledgers were created, or at the very least materially altered, long after they were purported to have been allegedly uttered. As evidence of this assertion, the People point to four main inconsistencies, as well as Kornfeld's failure to produce certain documents for review.
First, the ledgers produced by Kornfeld in response to Buomberger's accusations were typewritten versions of the original handwritten ledgers. At no point did Kornfeld provide the original handwritten ledgers allegedly created contemporaneously with the two 1955 acquisitions. As to the two deliveries in 1956, Kornfeld did eventually produce two handwritten ledgers purported to be created at the time the sales took place, but he failed to do so until nine years later in 2007. At the time that those original ledgers were finally produced for inspection, it was in response to a 2007 deposition in which Kornfeld was being examined regarding the questionable provenance of yet another Schiele artwork that he had previously sold, which is discussed in greater detail infra. The historical record is absolutely devoid of the existence of these so-called original ledgers until Kornfeld produced them in response to litigation in 2007 regarding another Schiele artwork sold by him.
Next, Kornfeld's statements regarding the number of deliveries and the details of those deliveries appear to have fluctuated over time. Based on interviews with Kornfeld conducted by Buomberger in furtherance of his research, Kornfeld reported that he had received a total of seven deliveries of artworks from the Grünbaum estate totaling 110 pieces, 70 of which were Schieles. When directly questioned about the transactions under oath, Kornfeld's responses call into question his veracity:
Q: In a book—the English translation of it is Robbed Art, Art Robbery—by Thomas Buomberger, he wrote that there were a total of seven deliveries totaling about 110 works equal to approximately 80 per cent of Fritz Gru nbaum's artistic estate. Do you believe that Mr Buomberger's statement is accurate?
A: (Through Interpreter) I do not know whether this information by this gentleman is correct or not.
A: Allow me to explain the different numbers as follows: the watercolour paintings from Mathilde Lukacs were purchased at three different points in time. These are three groups that are all recorded in the stock catalogue.
Q; Other than what you have produced to us here and the documents that we have seen, did you take any other notes about your meetings with Mathilde Lukacs?
A: (Through Interpreter) All the material that relates to that period has been produced by us here. Dr. Bratschi: All the material that we could find.
Q: How many deliveries of the works were there to you?
A: (Through Interpreter) I cannot produce that information in detail but according to the stock book you can see that the purchases were conducted in three phases.
An examination of all of Kornfeld's recorded statements between 1998 and 2007 reveals that Kornfeld attested to different facts on different dates. On some occasions, he stated there were seven separate transactions. On other dates, the total number of transactions was six. Some accounts detail three separate transactions, while the 2007 deposition suggests that there were only two purchases that were inventoried together on one receipt. Even more concerning, Mathilde Lukacs' signature on this receipt appears in pencil, not in ink like the rest of the information contained within the ledger:
Q: Returning now to page 17, the receipt, the name "Lukacs" appears at the top. What is the significance of that?
A: (Through Interpreter) Yes. This is a note made in pencil that gives of the name of the seller.
Q: Is that your handwriting?
A: (Through Interpreter) I assume so, yes.
Q: Do you have the original of this document?
A: Yes.
Q: May I see it? Thank you. Let the record reflect first of all that Lukacs on the top of the document is written in pencil. The rest of the document, except for the last two items towards the bottom, are written in ink and then the last two items are also written in pencil. Was the name Lukacs put on this document at the same time as the ink was put on the document?
A: (Through Interpreter) I presume not. This has to do with the filing of the documents. This document was to be filed under the name Lukacs which is why it carried that remark at the top.
Q: When, to the best of your knowledge, was the name Lukacs added in pencil?
A: (Through Interpreter) That I can no longer remember.
Prior Courts have also found Kornfeld's statements regarding his acquisition of Schiele paintings from Grunbaum's collection to be lacking in credibility:
In a single deposition, Mr. Kornfeld testified that he did not learn about Mr. Grunbaum until the late 1990s, and that he had never heard of Mr. Grunbaum. Neither of these statements appears to be true, as the 1956 sale catalog listed the provenance for the painting Dead City III as stemming from Mr. Grunbaum. Mr. Kornfeld also testified that [*24]all works in the sale catalog had the same provenance. Interestingly, German and Swiss governmental reports have listed Mr. Kornfeld as someone who trafficked in Nazi-looted art. Defendants have not disputed any of these facts, and have failed to meet their burden of showing that the artworks were not stolen, or that there is a question of fact necessitating trial.
Reif v. Nagy, 61 Misc 3d 319, 326—27 (NY Sup. Ct. 2018), aff'd as modified, 175 AD3d 107 (2019).
Plainly, Kornfeld's testimony that he did not know of the Grunbaum provenance of at least some of the Schieles in 1956 is false, as he listed "Dead City III" as originating from Grunbaum. Kornfeld testified that apart from his consultation of the 1930 catalog in creating the 1956 catalog, he had never heard of Grunbaum. However, there were three Schieles listed in the 1930 catalog attributed to Grunbaum's collection, while Kornfeld chose only to list one, "Dead City III," as explicitly attributed to Grunbaum in the 1956 catalog. He intentionally omitted Grunbaum's provenance as to the other two Schieles. Moreover, prior to the 1998 seizure of "Dead City III," Kornfeld denied ever corresponding with Mathilde. However, after the seizure Kornfeld claimed that the Artworks had provenance through Mathilde. While Kornfeld testified in 2007 that he acquired the Schieles from Mathilde in 1956, her name does not appear in the 1956 catalog. Nor does Mathilde's name appear in Otto Kallir's 1966 update of his 1930 catalog as the provenance for the Schiele works. He includes Galerie Kornfeld and his own Gallery in the provenance. This update was made after Otto Kallir purchased the corresponding Schieles from Kornfeld. Additionally, Otto Kallir's granddaughter, Jane Kallir, also makes no mention of Mathilde in the provenance histories of her 1988 catalog of Schiele artworks.
Further proving that he knew of the provenance of the Artworks, Kornfeld admitted that in 2001 he had written to Dr. Leopold, who had amassed the Leopold Collection containing "Dead City III," stating that Mathilde had told him in the 1950s that the entire Schiele collection at issue had been held in storage at Schenker, but not sold during World War II, and was then retrieved by Mathilde after the war. He maintained that when he asked her of their origin, Mathilde allegedly told him they were "an old Viennese family possession" and he declined to inquire further.
The records purporting to show that Mathilde sold a total of 113 works of art to Kornfeld from 1952 through 1956 at best are inconclusive. Kornfeld acknowledged in his deposition that the records he produced had Mathilde's signature and name added in pencil, while the rest of the page was written in ink. He also admitted that her name was not added contemporaneously with the purchase. Kornfeld confirmed that Mathilde's signature on key documents was misspelled and her signature did not appear in her handwriting. Kornfeld surmised that the signature could have been her secretary's. Petropoulos states that Kornfeld refused to allow the original documents to be examined by a handwriting expert.
We note that Kornfeld acquired three non-Schiele pieces as part of his acquisition of artworks in 1956. Grunbaum's 1939 property declaration specifically lists the three non-Schiele pieces acquired by Kornfeld.
Reif v. Nagy, 175 AD3d 107, 123—24 (App. Div. 1st Dept. 2019).
In addition to the concerns surrounding the veracity of Kornfeld's assertions, a review of the known facts as well as the available records casts further doubt upon the claim that Mathilde Lukacs was ever in legal possession of Russian War Prisoner prior to its acquisition by Kornfeld. Following the known timeline of events, on June 23, 1938, Mathilde and Sigmond Lukacs deposited their belongings, artwork included, into a Schenker-controlled storage facility. As part of that process, the Lukacses swore under oath that the items inventoried were in their possession prior to January of 1933, and that after that time they had acquired few other household items. Four days later, on June 27, 1938, the Lukacses filed an application for an export permit, listing among their belongings 25 total artworks, 23 of which were housed in frames. It is worth noting that Grünbaum's collection of Schiele artworks alone exceeded eighty pieces.
Four weeks after the Lukacs' belongings had been deposited at the Schenker facility, Kieslinger completed his inventory of Grünbaum's art collection. As part of that inventory, Kieslinger listed 452 artworks spread out over three rooms of the Grünbaum home, which included 81 works by Egon Schiele. Of the 81 Schiele pieces, Kieslinger documented five separately-listed and titled oil paintings, 55 sheets with colors, 20 pencil drawings, and one etching.
On August 12, 1938, the Lukacses belongings were stamped as leaving Austria via Vienna. Two days later on August 14, 1938, the Lukacses belongings were stamped as arriving in Passau, Germany. Nothing contained within those documents supports the theory that the Lukacses were in possession of any portion of Grünbaum's Schiele collection when they left Austria. In fact, the timeline and the inventories for both the Lukacses and Grünbaum's Schenker storage deposits suggests the exact opposite.
The Grünbaum inventory was deposited into Schenker on September 8, 1938. At that time, there was no change to the inventory indicating that any of the artwork contained within the initial inventory was removed before being deposited at the storage facility.
Following the end of World War II, Mathilde Lukacs made two official attempts certify heirship of her sister Lilly's estate. First on June 16, 1954, Mathilde applied to an Austrian court for a death certificate for Lilly, but withdrew the application one month later. Then again in 1959, Mathilde made a claim on behalf of her sister for restitution for some of Lilly's belongings including bank assets and jewelry. Notably, artwork was not included in this application. However, when the German government responded to her claim requesting a certificate to her right of inheritance, Mathilde again rescinded her application. Neither party has provided any records to this Court to demonstrate that Mathilde Lukacs was ever deemed the legal heir to her sister Lilly's estate, nor has prior litigation unearthed such a document. Absent that legal right of heirship, Mathilde would not have had legal title to any of Grünbaum's Schiele collection, let alone have been permitted to legally sell them.
In addition to this Court's own findings regarding the possibility of the Lukacs possession and transfer of Russian War Prisoner to Kornfeld, this Court will take judicial notice of the findings of other Courts in relation to this issue, as outlined below.
Bakalar v. Vavra, 819 F. Supp. 2d 293 (S.D.NY 2011), aff'd, 500 F. App'x 6 (2d Cir. 2012)
This case concerned another work by Egon Schiele titled "Seated Woman With Bent Left Leg (Torso)." Plaintiff David Bakalar filed a declaratory judgment action against defendants [*25]Vavra and Fischer seeking a ruling that Bakalar was the lawful owner of the Schiele work. In the action, Bakalar claimed that he had purchased the drawing in 1963 from Otto Kallir's Galerie St. Etienne, which in turn had purchased the work from Galerie Kornfeld. As part of his deposition in the Bakalar matter, Kornfeld, for the first time, claimed that he had purchased the Schiele collection contained within his 1956 catalog from Mathilde Lukacs. Vavra and Fisher counterclaimed seeking conversion and replevin. Following a bench trial, the Court awarded judgment of the painting to Bakalar, holding that he held lawful titled to the drawings and that the defendant's counterclaims were barred by laches. In doing so, the Court held that there was "simply no evidence as to how Lukacs acquired the Drawing, nor is there any evidence that might explain why Grünbaum's relatives did not pursue any claims against Lukacs. Without such evidence, Bakalar cannot meet his burden of proof on this issue." Id. at 299.
Bakalar suggests that the most likely explanation for Lukacs's possession of the Drawing is that it was given to her through a voluntary transfer such as a gift or for safekeeping. To create an inter vivos gift, 'there must exist the intent on the part of the donor to make a present transfer; delivery of the gift, either actual or constructive to the donee; and acceptance by the donee.' '[T]he proponent of a gift has the burden of proving each of these elements by clear and convincing evidence." As evidence of donative intent, Bakalar notes that Grunbaum's relatives were aware of Lukacs's possession of Grunbaum property and declined to pursue any claims against her. However, mere possession by a family member is insufficient to establish donative intent. Moreover, even if Grunbaum's heirs were aware of Lukacs's possession of the Drawing—or of Grunbaum property generally—inaction in the face of this knowledge is subject to multiple inferences, including, for example, a waiver of their claims.
Id. (internal citations omitted)
The Court found that Bakalar could not establish, by a preponderance of the evidence, that Grünbaum had voluntarily relinquished possession of the drawing, nor that he did so intending to pass title. The Court further found that Mathilde Lukacs had not acquired valid title to the drawing. Nevertheless, the Court awarded the drawing to Bakalar, citing the doctrine of laches.
It is important to analyze the Court's decision in Bakalar in relation to other, more recent events relating to artworks originating from Grünbaum's collection. First, this decision pre-dated the 2012 raid on Cornelius Gurlitt's apartment by German authorities, wherein 1,500 of pieces of stolen or otherwise looted artworks totaling over $1 billion in value were discovered. The Court's decision also pre-dated Kornfeld's 2017 deposition and admission that Gurlitt was a regular client of his. Kornfeld also admitted, through that deposition, that he had personally made several trips to Gurlitt's apartment in Munich to personally inspect and select artworks for purchase.
Reif v. Nagy, 61 Misc 3d 319 (NY Sup. Ct. 2018), aff'd as modified, 175 AD3d 107 (2019)
In an action brought before the United States District Court for the Southern District of New York, the co-heirs and co-executives of the estate of Fritz Grünbaum sued Richard Nagy, an art dealer, to determine the title of two Schiele pieces in Nagy's possession entitled Woman in a Black Pinafore and Woman Hiding Her Face. Nagy argued in opposition that he received good [*26]title of the artwork, as they, along with 52 other pieces, were sold to Kornfeld's gallery by Mathilde Lukacs.
The Court held that Nagy failed to show that [Fritz] Grünbaum voluntarily transferred the artworks during his lifetime, finding that "[a]lthough the Nazis confiscated Mr. Grünbaum's artworks by forcing him to sign a power of attorney to his wife, who was herself later murdered by the Nazis, the act was involuntary. [ . . . ] A signature at gunpoint cannot lead to a valid conveyance." 61 Misc 3d at 326.
A thief cannot convey good title. While defendants argue that they purchased the artworks in good faith, title remains with the original owner or his heirs absent a valid conveyance of the works. As defendants have not shown that Mr. Grunbaum ever voluntarily transferred the artworks to Ms. Lukacs, they cannot credibly allege that she owned them.
Moreover, any evidence to suggest that Ms. Lukacs possessed good title to the artworks is absent from the record. Mr. Kornfeld's deposition testimony in Bakalar reveals that he, an experienced art dealer, apparently did not request Ms. Lukacs to provide identification and confirm provenance when he purchased the artworks from her. He also failed to list her name in the sale catalog to show the provenance of the artworks. In addition, his testimony is inconsistent as to how he found out that the works in the sale catalog once belonged to Mr. Grunbaum.
Id.
The Court granted the Plaintiff's motion for summary judgment on replevin and conversion claims and denied the Defendants' motion for summary judgment. The Court further directed the parties to settle an order on notice vesting title of the artworks in Fritz Grünbaum's estate.
Reif v. Nagy, 175 AD3d 107 (1st Dept 2019)
Following the New York County Supreme Court's ruling, the Nagy appealed to the Appellate Division, First Department. The First Department affirmed. The Court found that the heirs of Fritz Grünbaum, had made a prima facie showing of superior title to the artworks by establishing that Grünbaum had owned the artworks prior to World War II and that he never voluntarily relinquished the artworks at any point thereafter. Reif v. Nagy, 175 AD3d 107, 120 (1st Dept. 2019)
Defendants argue that the Artworks belonged to Mathilde. However, they do not explain how Mathilde was able to acquire the Artworks either during the war or upon her return visits to Vienna after the war. Nor do defendants raise a triable issue of fact that Mathilde had valid title to the Artworks.
Id. at 125.
Importantly, the First Department's decision in Nagy further calls into question Kornfeld's credibility relating to the acquisition of Grünbaum's Schiele paintings:
The records purporting to show that Mathilde sold a total of 113 works of art to Kornfeld from 1952 through 1956 at best are inconclusive. Kornfeld acknowledged in his deposition that the records he produced had Mathilde's signature and name added in pencil, while the rest of the page was written in ink. He also admitted that her name was not added contemporaneously with the purchase. Kornfeld confirmed that Mathilde's signature on key documents was misspelled and her signature did not appear in her handwriting. Kornfeld surmised that the signature could have been her secretary's. [The expert report] states that Kornfeld refused to allow the original documents to be examined by a handwriting expert.
Id. at 123-24.
We note that there are no records, including invoices, checks or receipts documenting that the Artworks were purchased by Kornfeld from Mathilde.
Id. at 127.
The Court went on to surmise that, even if Mathilde Lukacs had in fact come into possession of Grünbaum's Schiele collection and sold it to Eberhard Kornfeld, her possession of the Schiele collection was not equivalent to legal title of the property. Id. at 127
Even accepting defendants' speculation that Elisabeth or Mathilde somehow managed to retrieve the Artworks, it was still misappropriated from, and lost to, Grunbaum and his legal heirs. [ . . . ] There is no evidence in the record that Elisabeth transferred title to the collection. Nor was Elisabeth able to convey good title as Grunbaum signed the purported power of attorney while imprisoned in Dachau. We reject the notion that a person who signs a power of attorney in a death camp can be said to have executed the document voluntarily.
Id. at 129.
Did the Art Institute of Chicago Make Reasonable Inquiries into the Provenance of Russian War Prisoner at the Time of Purchase or at Any Point Thereafter?
"In any prosecution for criminal possession of stolen property, it is no defense that the person who stole the property has not been convicted or apprehended or [ . . . that] the larceny of the property did not occur in [New York] state." PL §§ 165.60(1) and (3). "A collateral loan broker or a person in the business of buying, selling, or otherwise dealing in property who possesses stolen property is presumed to know that such property was stolen if he [or she] obtained it without having ascertained by reasonable inquiry that the person from whom he obtained it had a legal right to possess it." PL § 165.55(2) (emphasis added). As outlined in the statute, dealers in property, including artworks, have a duty to inquire that the property that they seek to obtain is legally possessed at the time that it is made available for sale. See, e.g.; People v. Agnello, 178 AD2d 414 (2nd Dept. 1991), appeal denied 79 NY2d 824; see also People v. Grossfeld, 216 AD2d 319 (2nd Dept. 1995), appeal denied 86 NY2d 735. In Porter v. Wertz, the First Department held that when artwork comes to a gallery under suspicious circumstances, it necessarily demands a higher level of inquiry to ensure that purchase of that artwork is lawful. 68 AD2d 141, 145-147, 149 (1st Dept. 1979), aff'd, 53 NY2d 696, (1981) ("Indeed, commercial indifference to ownership or the right to sell facilitates traffic in stolen works of art. Commercial [*27]indifference diminishes the integrity and increases the culpability of the apathetic merchant.").
While "reasonable inquiry" is not expressly defined within the law, this Court will examine the totality of the circumstances in determining whether Respondent engaged in a reasonable inquiry as to the provenance of Russian War Prisoner at the time of its purchase in 1966 or any time thereafter.
The Art Institute of Chicago's Publicly-Issued Provenance Standards
Objectively, it seems fair to begin the evaluation of Respondent's provenance research of Russian War Prisoner based upon their own publicly-issued guiding principles. The Art Institute of Chicago's website features a well-developed mission statement regarding the importance of provenance research. "By asking who owned or cared for these objects in the past (their "provenance"), [the Art Institute of Chicago] strive[s] to deepen our understanding of the artworks, the people who valued them, and the societies these objects inhabited as they traveled through time and from place to place. In other words, provenance research allows us to look beyond the object's surface and to tell a fuller story."[FN86]
"The aim of provenance research is to trace the history of an object from the time it leaves the artist or maker's hands to its arrival at the Art Institute: Where and when was it first acquired? Who owned it next? For how long? Why and how did the object leave each owner's care?"[FN87]
"Provenance research is central to museum practice: acquisitions, exhibitions, loans, and even artworks leaving our collection. Crucially, it also ensures the ethical stewardship of the objects in our care."[FN88]
In addition to publicly emphasizing the importance of proper provenance research, Respondent's website boasts a five-member research team consisting of an executive director, director, senior research associate, and two doctoral fellows, all of whom are focused exclusively on researching the provenance of the artworks within their collections.[FN89]
Notably, Respondent's website emphasizes that their Executive Director of Provenance Research, Dr. Jacques Schuhmacher, who was hired in 2024 after this litigation began, recently published a research guide focused on the Nazi-Era Provenance of Museum Collections.[FN90]

Through their motion papers, Respondent asserts that the Art Institute of Chicago "maintains its own in-house Ryerson and Burnham Libraries in addition to access to external databases and resources, to uncover crucial information about works in AIC's collection. Consistent with its commitment to provenance research, AIC has, for nearly two decades, [*28]endeavored to provide full provenance information for works in its collection on its website so that any member of the public can instantly learn the known provenance of any particular work."[FN91]

American Alliance of Museums Provenance Research Standards
More broadly, in determining whether reasonable inquiries were made, this Court will rely on the American Alliance of Museum's Guide to Research Provenance to provide a rubric for the Court's evaluation. The AAM Guide instructs museums to identify artworks within their collections that underwent a change of ownership during World War II as well as items that were or might reasonably be thought to have been in continental Europe between those dates, with a specific eye towards "identify[ing] those [artworks] whose characteristics or provenance suggest that research be conducted to determine whether they may have been unlawfully appropriated during the Nazi era without subsequent restitution." [FN92]
The AAM Guide further instructs museums to undertake provenance research within their own records and by employing the assistance of "established archives, databases, art dealers, auction houses, donors, scholars, and researchers who may be able to provide Nazi-era provenance information."[FN93]
Finally, the Guide instructs museums to make provenance research on those artworks accessible, and give priority to continuing provenance research as resources allow. Id.
Initial Research and Paperwork Completed at the Time of Acquisition
As part of the extensive and thorough briefs submitted by both parties to this matter, this Court was provided with a copy of the original 1966 Intake Report completed by Respondent when they purchased Russian War Prisoner. While the intake report lists detailed descriptions regarding, among other details, the artist, title, date, medium, credit, condition, signature, and miscellaneous remarks, the only information under the "Price and Source" section lists that the artwork was sourced from "B.C. Holland, Chicago." There is no further information documenting the artwork's provenance.
An examination of the July 21, 1966 Art Institute of Chicago Committee on Prints and Drawings meeting minutes reveals no evidence of further provenance research regarding the purchase of Russian War Prisoner.[FN94]

[*29]Additional Provenance Research Completed After Acquisition
This Court was also provided with a copy of correspondence between the Art Institute of Chicago and Eberhard Kornfeld from 2002, 36 years after its purchase, in which an intern working in the Department of Prints and Drawings inquired as to the provenance of Russian War Prisoner:
September 27, 2002
Dear Mr. Kornfeld,
I am an intern in the Department of Prints and Drawings researching the provenance of several works in our permanent collection. As you might know, the Art Institute is currently engaged in a museum-wide research project for works of art with wartime provenance gaps. I was hoping that you might be able to shed some light on a piece sold by Gutekunst & Klipstein in the Egon Schiele exhibition of September-October 1956. The drawing was catalogued as number 39. It is:
Russian Prisoner of War, 1916
Watercolor and graphite
438 x 308 mm.
I am also sending a Xeroxed copy to aid in its identification. Through our research, we have reason to believe that this drawing was previously part of the Fritz Grünbaum collection, which was sold by Mathilde Lukacs through Gutekunst & Klipstein in 1956. Can you confirm this information? Was Ms. Lukacs indeed the seller in 1956?
In addition to The Russian War Prisoner, Rudolf Leopold suggested that the Art Institute may own another work that was previously in the Grünbaum collection. If this is true, I would assume that it would have also been sold by Gutekunst & Klipstein for Ms. Lukacs. They are:
The Artist's Mother, 1907
Chalk
425 x 295 mm.
Self Portrait, 1913
Graphite and gouache
465 x 320 mm.
(emphasis added)
Kornfeld authored his reply to the Art Institute of Chicago via facsimile the very next day:
Bern, September 28th, 2002
With thanks for your fax I can inform you that Egon Schiele, the Portrait of a Russian Prisoner, was lot 39 in our stock catalogue No. 57. The exhibition took place from September 8th to October 6th, 1956. This watercolor came from the Grünbaum collection. We had bought the Grünbaum collection from Mrs. Lukacs, the sister from the widow Grünbaum. The collection of Grünbaum was never seized by Nazi authorities. The widow could keep it and gave it to her sister. The sister kept the collection until 1955 and sold it thereafter in different parts.
As far as I remember, the 'Self Portrait' and 'The Artist's Mother' have never been in my hands.
I suppose that the Schiele catalogue from 1956 is in your library.
With kind regards and special greetings to Suzanne, Sincerely yours,
[signed] Eberhard Kornfeld
(emphasis added)
It is important to contextualize this exchange between the Art Institute of Chicago and Eberhard Kornfeld with the relevant surrounding circumstances. The exchange occurred just four years after Buomberger's scathing exposé implicating Kornfeld in the sale of Nazi-looted artwork via Switzerland in the aftermath of World War II. It also came directly on the heels of American Association of Museum Directors Task Force's 1998 Report on the Spoliation of Art during the Nazi/World War II Era as well as the 2001 American Alliance of Museums Guide to Provenance Research which specifically warned of issues regarding questionable provenance of artwork originating from Europe in the years following World War II. Despite these vibrant red flags, it appears as though the Art Institute of Chicago did nothing further to corroborate the account of a man whose credibility had directly been called into question on this very issue, and a man who was an "interested witness" due to the personal implications that would arise from the outcome of this matter.
Nevertheless, following this exchange and without conducting any further research into the matter, the Art Institute of Chicago updated its provenance records in relation to Russian War Prisoner. Records dated October 7, 2002 state the following in regard to the ownership history of the artwork:
Provenance:
Fritz Grünbaum (died 1941), Vienna. By descent to his wife, Elizabeth. By descent to her sister, Mathilde Lukacs, Brussels, to 1955 [according to a letter from Eberhard Kornfeld dated 28 September 2002 in curatorial file]. Sold by Gutekunst & Klipstein, Bern, 1956, no. 39. Sold by Galerie St. Etienne, New York, 1957, no. 25. Given by Dr. Eugene Solow and family to the Art Institute, 1966.
Provenance Remarks:
The works sold in the 1956 G & K exhibition were probably consigned to sale by Mathilde Lukacs, the sister-in-law of Fritz Grünbaum, an Austrian Jew who died in WWII. The painting, "Dead City III," from the Leopold Collection in Austria that was sequestered by the state of New York following its exhibition at MOMA has the same [*30]provenance, according to Rudolf Leopold. Although the controversy surrounding the work drew international attention, it was eventually returned to the Leopold collection as it was determined that the painting was sold legally in 1956 by Ms. Lukacs who was at that time Grünbaum's closest living relative. Therefore, if it is true that our work was also sold by Ms. Lukacs, then all is probably well for this work. I have written to Eberhard Kornfeld for confirmation on this. In his letter, Kornfeld has confirmed this to be true!
Otto Kallir of Galerie St. Etienne probably purchased the work from the 1956 Bern sale, as I know he purchased many works from there.
[ . . . ]
Provenance Status:
Provenance not reviewed [FN95]
(emphasis added)
Here, given the totality of the circumstances, this Court cannot conclude that Respondent's inquiries into the provenance of Russian War Prisoner were reasonable. Starting at the end of World War II in 1945 and through to the present day, art dealers, collectors, and institutions have been issued nearly constant warnings to carefully investigate and evaluate pieces of art that originated from Europe with provenance gaps around the World War II era. In fact, the evidence shows that the Art Institute of Chicago was personally served with these warnings on multiple occasions by governmental agencies as well as non-governmental organizations such as professional art associations with whom Respondent is affiliated. Despite these near-constant warnings, the evidence shows that little to no provenance research was completed by Respondent at the time they acquired Russian War Prisoner. Further, the record demonstrates that no additional research or interrogatories were completed by Respondent between their acquisition of the artwork in 1966 until their e-mail to Kornfeld in 2002. When Respondent did eventually reach out to Kornfeld 36 years later, Respondent relied solely on one-paragraph in a fax from him vouching for the work's provenance. This was despite the fact that Kornfeld had been "outed" as a prominent dealer in Nazi-looted art four years prior.
Respondent's inquiries fail to live up to their own publicly-stated standards of "deepen[ing] [their] understanding of the artworks, the people who valued them, and the societies these objects inhabited as they traveled through time and from place to place." In this instance, the Art Institute of Chicago failed to determine "why and how [Russian War Prisoner] [left] each owner's care" and fell short of their self-imposed standard of "ensur[ing] the ethical stewardship of the objects in [their] care."
Next, this Court will examine Respondent's actions against the standards set forth by the American Alliance of Museum's Guide to Research Provenance. In the 36 years that elapsed between Respondent's acquisition of Russian War Prisoner in 1966 and their sole letter to Kornfeld in 2002, Respondent never identified the artwork as a piece that "underwent a change in ownership during World War II" or an artwork that "[was] or might reasonably be thought to [*31]have been in continental Europe between those dates,"[FN96]
despite the fact that Respondent clearly had information confirming that fact at the time of their purchase in 1966. Nor did they undertake provenance research at any point in the intervening 36 years before 2002 to further investigate the information that was directly before them, despite receiving frequent warnings from the government, multinational governmental organizations, and non-governmental professional art organizations. When even more glaring evidence in regard to Russian War Prisoner's provenance came to the fore in the late 1990's with the exposé on Kornfeld's practices, Respondent failed to undertake any provenance research to corroborate Kornfeld's claims. Nor did they employ the assistance of "established archives, databases, art dealers, auction houses, donors, scholars, and researchers who may be able to provide Nazi-era provenance information."[FN97]
They instead relied upon the assurances of a discredited art dealer with an obvious self-serving agenda, and accepted as fact that "[i]n his letter, Kornfeld has confirmed this to be true!"[FN98]

Given these facts, this Court cannot come to the conclusion that Respondent's actions constituted a "reasonable inquiry."
II. Does New York County Have Jurisdiction Over This Application?
Next, the Court must determine whether New York County Supreme Court has jurisdiction over this matter. CPL § 20.20 states, in relevant part:
[A] person may be convicted in the criminal courts of [New York] State of an offense defined by the laws of this state, committed either by his own conduct or by the conduct of another for which he is legally accountable [ . . . ] when, conduct occurred within [New York] State sufficient to establish (a) an element of such offense, (b) an attempt to commit such offense; or (c) a conspiracy or criminal solicitation to commit such offense, or otherwise establish the complicity of at least one of the persons liable therefore; provided that the jurisdiction [ . . . ] extends only to conviction of those persons whose conspiratorial or other conduct of complicity occurred within this state. CPL § 20.20(1)(a-c).
Here, the offense at issue is Criminal Possession of Stolen Property in the First Degree pursuant to PL § 165.54, a class B Felony, which states that a person is guilty "when he knowingly possesses stolen property, with intent to benefit himself or a person other than an owner thereof or to impede the recovery by an owner, and when the value of the property exceeds one million dollars." PL § 165.54. CPL § 20.30(1) provides further limitations upon New York's jurisdiction:
Notwithstanding the provisions of section 20.20, the courts of this state do not have jurisdiction to convict a person of an alleged offense partly committed within this state but consummated in another jurisdiction, or an offense of criminal solicitation, conspiracy or attempt in this state to commit a crime in another jurisdiction, or an offense of criminal facilitation in this state of a felony committed in another jurisdiction, unless the conduct constituting the consummated offense or, as the case may be, the conduct constituting the crime solicited, conspiratorially contemplated or facilitated, constitutes an offense under the laws of such other jurisdiction as well as under the laws of this state.
Under Illinois statute Chapter 720, Criminal Offenses, § 5/16-1(a) (1), (4), and (5), a person is guilty of the crime of theft when such person:
knowingly obtains or exerts unauthorized control over property of the owner," or "obtains control over stolen property knowing the property to have been stolen or under such circumstances as would reasonably induce him or her to believe that the property was stolen" or "obtains or exerts control over property in the custody of any law enforcement agency which any law enforcement officer or any individual acting in [sic] behalf of a law enforcement agency explicitly represents to the person as being stolen or represents to the person such circumstances as would reasonably induce the person to believe that the property was stolen, and intends to deprive the owner permanently of the use or benefit of the property.
Therefore, the conduct constituting the consummated offense, in this case, Criminal Possession of Stolen Property, constitutes an offense under the laws of both the State of New York and the State of Illinois. As it relates to Russian War Prisoner, Otto Kallir knowingly possessed the artwork within the confines of New York County while he knew, or should have known, that the painting was stolen. Due to a lack of due diligence and a failure to conduct proper provenance research at the time of acquisition or any point thereafter, Respondent also possessed Russian War Prisoner while they knew, or should have known, that the painting was stolen.
a. Was an Overt Act In Furtherance of a Conspiracy Committed in New York State?
"A person may be prosecuted for conspiracy in the county in which he entered into such conspiracy or in any county in which an overt act in furtherance thereof was committed." PL §105.25(1) (emphasis added). Here, Russian War Prisoner was imported from Europe to New York County, where it was housed and displayed at Galerie St. Etienne before its subsequent sales. While in New York County, it was openly exhibited to increase the painting's value. It was then sold from New York County to a Connecticut art dealer before subsequent sales landed the painting at the Art Institute of Chicago. Therefore, Kallir's possession, exhibition, and subsequent sale of Russian War Prisoner constitute overt acts in furtherance of the conspiracy that occurred within the confines of New York County.
b. Does Possession of Stolen Property Constitute a Crime in Both New York City and Chicago?
"An agreement made within [New York] state to engage in or cause the performance of conduct in another jurisdiction is punishable herein as a conspiracy only when such conduct would constitute a crime both under the laws of [New York] state if performed herein and under the laws of the other jurisdiction if performed therein." PL § 105.25(2). As previously stated, Criminal Possession of Stolen Property constitutes an offense under the laws of both the State of New York and the State of Illinois.
c. If the Agreement was Made in Another Jurisdiction, Is It Punishable in New York if an Overt Act of Conspiracy Was Committed within New York City?
Finally, "[a]n agreement made in another jurisdiction to engage in or cause the performance of conduct within this state, which would constitute a crime herein, is punishable herein only when an overt act in furtherance of such conspiracy is committed within this state." PL 105.25(3).
As explained supra, Kallir's possession, exhibition, and subsequent sale of Russian War Prisoner were all overt acts in furtherance of the conspiracy that occurred within the confines of New York County, therefore conferring jurisdiction over this matter to New York County.
III. Is New York County's Turnover Order Time Barred?
As explained in further detail herein, New York County's turnover order is not barred by a statute of limitations, the doctrine of laches, or adverse possession.
Criminal Statues of Limitations
It is a long-held principle of criminal law that most offenses, other than capital offenses, are subject to statutes of limitations that regulate the time frame in which an offender can be prosecuted. In New York State, a felony prosecution must be commenced within five years after the commission of the crime. CPL § 30.10(2)(b). For crimes that are ongoing in nature, the statute of limitations begins to run when the criminal offense terminates, not when it initiates. See, e.g. People v. Milman, 164 AD3d 609, 611 (2nd Dept. 2018) ("When offenses are charged as continuing crimes, the statute of limitations begins to run on the 'termination and not the starting date of the offense.' As a result, the statute of limitations does not begin to run until the final taking.") quoting People v. Perry, 114 AD3d 1282, 1283 (4th Dept. 2014), People v. Randall—Whitaker, 55 AD3d 931, 931 (2nd Dept. 2008), People v. Eastern Ambulance Serv., 106 AD2d 867, 868 (4th Dept. 1984).
Criminal Possession of Stolen Property, PL § 165.54
In New York State, Criminal Possession of Stolen Property is considered a continuing offense. See, e.g. People v. Miernik, 284 AD2d 919, 919 (4th Dept. 2001) (Finding that criminal possession of stolen property in the fourth degree was a continuing offense when defendant used a stolen credit card multiple times in one day at different locations). Illinois law also deems Criminal Possession of Stolen Property a continuing offense. See, e.g. People v. Walton, 2013 IL App (3d) 110630 (Appellate Court of Illinois, 3rd Dist. 2013), citing People v. Price, 221 Ill.2d [*32]182, 193 (2006) ("Possession of stolen property under subsection [S.H.A. 720 ILCS 5/16—1](a)(1) is a continuing crime. It is continuously violated by a person who maintains unauthorized possession over property that she does not own."). To date, Russian War Prisoner is still considered stolen property because, despite the passage of almost an entire century, the artwork has yet to be returned to its rightful owners. Therefore, the statute of limitations as it related to the alleged thieves of Russian War Prisoner had not even begun to toll until the artwork was seized by this Court on September 12, 2023. Even so, the recovery of stolen items is subject to no such time constraint. While it may provide relief from prosecution for a thief, the lapsing of a criminal statute of limitations does not clear title to a stolen item. The statute of limitations applies to the person, not the property. As previously stated, "in New York, a thief cannot pass good title." Bakalar, 619 F.3d at 140 (2d Cir. 2010).
Conspiracy in the Fourth Degree, PL § 105.10
The People further allege that Respondent's possession and display of Russian War Prisoner is the "culmination of a multinational conspiracy that has been in continuous operation since at least the 1950's and involves numerous conspirators and many dozens of distinct overt and criminal acts."[FN99]
The People argue that art trafficking conspiracies differ from traditional conspiracy schemes in that the proceeds of the conspiracy, namely the looted artwork, must be hidden in plain sight:
Indeed, it is the display of the artwork—ideally in a prominent museum—that most effectively increases its value. That is one reason so many high-end collectors loan their pieces to prominent museums for display—usually accompanied by a conspicuously displayed object label lavishly extolling the selfless largesse of the donor. [ . . . ] In other words, bolstering the legitimacy of an artwork is precisely what gives it value in the art market. The moment the veil is lifted, the artwork is exposed as stolen. Whoever is left holding the stolen artwork once it has been exposed is now holding a toxic, worthless asset.[FN100]
Therefore, the People contend that a conspiracy to traffic art is "ongoing as long as the art that is being trafficked is still being displayed and sold at prices that are only possible if the artwork is legal."[FN101]
As it relates to Russian War Prisoner directly, the People assert that "[Respondent's] subsequent purchase and display of Russian War Prisoner further increased the value of the drawing and served [Respondent] well by bolstering their collection's reputation in the art world."[FN102]

"The crime of conspiracy is an offense separate from the crime that is the object of the conspiracy." People v. McGee, 49 NY2d 48, 57 (1979). "Once an illicit agreement is shown, the overt act of any conspirator may be attributed to other conspirators to establish the offense of conspiracy and that act may be the object crime." Id. As it relates to Russian War Prisoner, the conspiracy began when the artwork was taken from Fritz Grünbaum by the Nazis and stored in the Schenker facility. It was continued when the artwork made its way to Eberhard Kornfeld, who failed to investigate whether the artwork had clean title, despite receiving multiple Schiele artworks that he either knew, or should have known, originated from Grünbaum's collection. Kornfeld sold the artwork to Kallir, and later admitted that the two men did not discuss the artwork's provenance as part of the sale. Since Grünbaum lent Russian War Prisoner to exhibitions either directed or supported by Kallir, it logically follows that Kallir knew, or should have known, that the artwork originated from Grünbaum's collection, as Kallir had not one, but two, opportunities to view the artwork. Kallir then publicly showcased Russian War Prisoner in New York County, adding to its value, before selling it to a private art collector. Respondent purchased the artwork without conducting proper due diligence and thereafter without conducting proper provenance research, despite numerous warnings from state and professional agencies regarding the need to thoroughly investigate artworks with wartime provenance gaps. Respondent placed Russian War Prisoner on display at their museum, further increasing its value. The law does not require evidence that each conspirator "took part in every act done in furtherance of the conspiracy, or that [they were] cognizant of every such act." People v. Winter, 288 NY 418, 421 (1942). The consistent failure to investigate Russian War Prisoner's provenance flies in the face of art industry standards. This demonstrates a community of purpose amongst the co-conspirators that sustains the theory of a continuing conspiracy beginning when Russian War Prisoner was taken by the Nazis and continuing until the present day. Under this theory, the conspiracy is still considered ongoing, and therefore the statute of limitations has not yet begun to run.
Civil Statute of Limitations
Respondent further argues that this action is time barred as the civil statute of limitations has already run as it relates to this matter.[FN103]
Specifically, Respondent implores this Court to impose the three-year statute of limitations that federal Courts have imposed upon similar matters pending before them. See, e.g. Solomon R. Guggenheim Found. v. Lubell, 77 NY2d 311, 318 (1991). However, as previously noted, this is not a civil action, but a criminal one. Therefore, any argument to impose a civil statute of limitations upon this application is unavailing. In fact, just last month, the United States Court of Appeals for the Second Circuit ruled that Respondent failed to conclusively establish a statute of limitations defense in their civil suit regarding Russian War Prisoner. Reif v. Art Institute of Chicago, 24-809-CV (2nd Cir. Ct. App., March 11, 2025) ("We conclude that the statute of limitations defense is not conclusively established on the face of the proposed [Second Amended Complaint]. The SAC plausibly alleges that the HEAR Act saves plaintiffs' claims, and while further factual development may or may not support that allegation, the question is not beyond doubt, based on the allegations of the SAC itself. As a result, the District Court erred in finding that amendment [*33]would have been futile.") 
Doctrine of Laches
The doctrine of laches is an equitable doctrine which bars the enforcement of a right where there has been an unreasonable and inexcusable delay that results in prejudice to a party. The mere lapse of time without a showing of prejudice will not sustain a defense of laches. In addition, there must be a change in circumstances making it inequitable to grant the relief sought. Prejudice may be established by a showing of injury, change of position, loss of evidence, or some other disadvantage resulting from the delay." Skrodelis v. Norbergs, 272 AD2d 316, 316—17 (2nd Dept. 2000).
First and foremost, the doctrine of laches does not apply to criminal cases. See, e.g., United States v. Batson, 608 F.3d 630, 633 (9th Cir. 2010) ("Like the Second Circuit, '[w]e have found no case applying a laches defense in the criminal context,'" quoting United States v. Milstein, 401 F.3d 53 [2d Cir. 2005]). Seeing as this "civil-like" proceeding arises as part of a criminal investigation and concerns stolen property as defined by PL § 155.05, the doctrine of laches does not apply.
Even assuming arguendo that the nature of this civil-like proceeding that developed within a criminal case would make the doctrine of laches applicable, Respondent's argument still fails. In order to successfully apply the doctrine of laches, a party must show that a change of circumstances, either through the loss of evidence or some other disadvantage resulting from an unreasonable and inexcusable delay, would make it inequitable to grant the relief sought. There has been no such showing here. Starting with the delay in bringing forth the current action, the transnational and systemic looting, secreting, selling and re-selling of Nazi-looted art over the course of close to a century, perspicuously qualifies as one of the most complex investigations that could possibly arise. The voluminous motions and accompanying evidence filed by both parties in relation to this matter strongly endorses that point. Viewing this action in light of the atrocities that preceded it and the complexities of the investigation into the artwork's provenance, the delay in bringing forth this action was reasonable. Other than the passage of time, Respondent has failed to sufficiently demonstrate a change in circumstances that would make it inequitable to grant the relief sought. Despite ongoing litigation regarding this specific artwork, Respondent failed to speak with Kornfeld during the five-year period before his death. Though some witnesses have since passed away, namely Kornfeld in 2023, the evidence demonstrates that Respondent had an opportunity to speak with Kornfeld regarding the provenance of Russian War Prisoner in 2002 and again via an expert interview in 2018.
Additionally, the United States Court of Appeals for the Second Circuit recently ruled that Respondent had failed to establish that the doctrine of laches applies in relation to this very artwork. Reif v. Art Institute of Chicago, supra at p.10 ("In sum, we conclude that the allegations of the [Second Amended Complaint] do not, read together with matters of which we may take judicial notice, establish on their face that the Bakalar decision has preclusive effect on this matter as to the question of laches."), citing Bakalar, supra.
Adverse Possession
Finally, Respondent posits that, if Russian War Prisoner does in fact constitute "stolen [*34]property," then its recovery is barred by the doctrine of adverse possession. Adverse possession is a legal theory under which a person who does not have legal title to property can acquire legal ownership of said property based on continuous possession without the permission of the property's legal owner. To establish a claim of adverse possession in New York State, a party is required to show that possession of the disputed property was: (1) hostile and under claim of right; (2) actual; (3) open and notorious; (4) exclusive; and (5) continuous for the required period. Rote v. Gibbs, 195 AD3d 1521, 1523 (4th Dept. 2021).
As an initial matter, adverse possession is a civil doctrine, not a criminal one. As previously established, the action before this Court, although a civil-like proceeding, is ultimately criminal in nature. And even in civil proceedings, adverse possession is "not a favored method of procuring title." Walling v. Przbylo, 7 NY3d 228, 233 (2006). For argument's sake, even if the Court were to consider applying the doctrine of adverse possession to this matter, such application would render an outcome that is completely inappropriate and morally repugnant under the circumstances. This Court will not deny the heirs of a Holocaust victim their family heirlooms under a theory of adverse possession.
IV. Is CPL § 450.10 the Appropriate Mechanism for the Requested Relief?
Next, this Court must determine whether PL § 450.10 is the appropriate mechanism for the relief requested.
Criminal Procedure Law § 690.10 states, in pertinent part, that personal property is subject to seizure pursuant to a search warrant if there is reasonable cause to believe that the property is either stolen, unlawfully possessed, or constitutes evidence or tends to demonstrate that an offense was committed in New York State or another state. CPL §§ 690.10 (1) (2) & (4). "Upon seizing property pursuant to a search warrant, a police officer must without unnecessary delay return to the court the warrant and the property, and must file therewith a written inventory of such property, subscribed and sworn to by such officer." CPL § 690.50(5). Upon receiving property seized pursuant to a search warrant, the Court must retain the property in the custody of the Court pending further disposition. CPL § 690.55(1)(a).
When property other than contraband alleged to have been stolen is in the custody of a District Attorney and a request is made for the return of the property, the District Attorney must provide written notice to the defendant or his counsel of the request for return as soon as practicable. PL § 450.10(1). "For good cause shown the Court may order retention of the property for use as evidence by either party." PL § 450.10(2). If stolen property comes into the custody of the Court, it must, unless temporary retention be deemed necessary in furtherance of justice, be delivered to the owner, on satisfactory proof of his title. CPL § 450.10(5). The "disposal of property" statute aims "to balance the diverse and competing interests of the owner of the property, the prosecution, and the defense." PL § 450.10 Practice Commentary (McKinney).
The owner generally seeks the speedy, if not instantaneous, return of the property. The prosecutor may need to inspect the property, to have some test performed with respect to it, or to show the property to the jury at trial. The defense may similarly desire to inspect and test the property and have it available for trial. The Legislature has sought to emphasize the speedy return of the property to its owner, without unnecessarily [*35]compromising the interests of the prosecution and the defense. Id.
See also Matter of Marpole, 145 Misc 2d 549, 552 (Fam. Ct. 1989) (the purpose of CPL § 450.10 is to attempt to balance the due process rights of the accused against a crime victim's right to return stolen of property); People v. Howard, 122 Misc 2d 26, 29 (Crim. Ct. Kings County, 1983) ("Thus, the amendments to section 450.10 were designed to satisfy a twofold purpose: [T]o accomplish the prompt return of stolen property to a victim entitled to the possession of that property and to establish an extrajudicial administrative procedure which would, at the same time, protect a defendant's right to inspect the property and preserve legally sufficient evidence for introduction at trial.") citing People v. Lazarus, 114 Misc 2d 785, (Crim. Ct. Nassau County, 1982).
The New York State Court of Appeals has held that PL § 450.10 "requires proof of title before property in the custody of the People or the court can be returned." In re Grand Jury Subpoena Duces Tecum Served on Museum of Mod. Art, 93 NY2d 729, 740 (1999). The Court further held that a "civil-like proceeding would have to be commenced [ . . . ] to return the paintings to the rightful owners under either CPL § 610.25(2) or PL [§] 450.10 — regardless of the outcome of the People's case." Id. Notably, this civil-like proceeding is meant to be held "prior to, or during the pendency of a criminal proceeding [ . . . ] regardless of the outcome of the People's case." Id. Codified law and caselaw alike are devoid of any requirement that formal charges be filed against a person or entity in order to initiate such a proceeding. However, important context is also gleaned from CPL § 1.20(18), which defines a "criminal proceeding" as "any proceeding which (a) constitutes a part of a criminal action or (b) occurs in a criminal court and is related to a prospective, pending or completed criminal action, either of this state or of any other jurisdiction, or involves a criminal investigation."
Here, while formal charges have not been filed against Respondent, or any of the surviving alleged co-conspirators, this matter could either be classified as relating to a prospective criminal action or involving a criminal investigation. Such proof establishes that Russian War Prisoner was improperly removed from the custody and control of Fritz Grunbaum, before being sold by Eberhard Kornfeld to Otto Kallir, bringing the artwork into the confines of New York County. It then stayed in New York County for a number of years before being sold to art collector David Kimball. The People have provided sufficient proof to establish that Russian War Prisoner constituted "stolen property" before, during, and after the time that the artwork was within the confines of New York County. Therefore, if the People sought to charge any of the surviving alleged co-conspirators, the investigation into the artwork could either be classified as being related to a prospective criminal action. Alternatively, this action could also be properly based purely upon a criminal investigation into stolen property that was laundered through New York County for a period of years. Either way, this Court finds that this matter can, and should, be adjudicated pursuant to CPL § 450.10.
On September 12, 2023, this Court signed a search warrant permitting a search of the inventory of the Art Institute of Chicago for Russian War Prisoner. The artwork has since, on consent, been subjected to a seizure-in-place order to allow for written motions to be filed, oral argument to be presented, and to afford the Court an opportunity to review all the pertinent evidence. To that end, the Court accepted voluminous and evidence-rich filings from both the People and the Art Institute of Chicago which chronicled the history of the painting's ownership [*36]and movement over the past century and outlined pertinent law affecting the resolution of the issue of ownership. The Court heard highly-skilled oral arguments from the parties throughout several sessions in the fall of 2024, and subsequently accepted additional filings regarding additional issues raised throughout the hearings. Therefore, this Court believes that the requirements of CPL § 450.10 have been properly satisfied.
Respondent's Motion for Discovery Compliance, to Invalidate the People's Certificate of Compliance, and for Sanctions
In 2019, the New York State Legislature significantly amended the discovery requirements outlined in the Criminal Procedure Law, repealing CPL Article 240 and enacting CPL Article 245 in its place. The new automatic discovery statute requires that the prosecution disclose, among other evidence, "all items and information that relate to the subject matter of the case and are in the possession, custody or control of the prosecution or persons under the prosecution's direction or control." CPL § 245.20(1).
Once the People have fulfilled their discovery requirements as outlined in CPL Article 245, with the exception of discovery that has been lost or destroyed pursuant to CPL § 245.80(1)(b) or subject to a protective order pursuant to CPL § 245.70, a Certificate of Compliance (hereinafter, "COC") must be filed pursuant to CPL § 245.50. The COC affirms that "after exercising due diligence and making reasonable inquiries to ascertain the existence of material and information subject to discovery, [the People have] disclosed and made available all known material and information subject to discovery." CPL §§ 245.50(1). The People must also provide a list detailing all of the discovery provided to the defense. Id. In the event that additional materials are discovered or created, the People must file a supplemental COC. "The filing of a supplemental [COC] shall not impact the validity of the original [COC] if filed in good faith and after exercising due diligence pursuant to [CPL] section 245.20 [ . . . ], or if the additional discovery did not exist at the time of the filing of the original [COC]." CPL § 245.50(1-a). The People further have a continuing duty to disclose information that they subsequently learn exists which was required to be disclosed. CPL § 245.60. Upon learning of the existence of said information, the People must disclose that evidence to the defense and file a supplemental COC. CPL § 245.50. This makes clear that when drafting Article 245, the Legislature contemplated and accommodated for the filling of supplemental COC throughout the life of a case. 
"No adverse consequence to the prosecution or the prosecutor shall result from the filing of a [COC] in good faith and reasonable under the circumstances." CPL § 245.50(1). The Court may grant a remedy or sanction for a discovery that is appropriate and proportionate to the prejudice suffered by the party entitled to disclosure. CPL § 245.80. Regardless of a showing of prejudice, the party entitled to disclosure shall be given reasonable time to prepare and respond to the new material. Id. 
Following the conclusion of oral arguments on September 27, 2024 and with leave from the Court, Respondent submitted a supplemental motion dated December 31, 2024, arguing that the People "intentionally withheld thousands of pages of material that are plainly relevant to the proceeding, including documents that (i) were specifically requested by AIC; (ii) directly undermine specific arguments the People have made to this Court; and (iii) directly support [*37]arguments AIC has advanced."[FN104]
Respondent's argument mainly concerns "nearly 400 pages of material obtained pursuant to eight grand jury subpoenas that had been served as early as 2022, as well as reports and other documents from the Department of Homeland Security."[FN105]
Respondent further argues that the disclosure included "numerous documents of direct relevance to this proceeding, including direct communications between the People's alleged co-conspirators, Eberhard Kornfeld and Otto Kallir, regarding their art transactions — which is, of course, at the heart of the People's theory and the asserted 'Kornfeld-Kallir Conspiracy' — as well as the only known written statements of David Kimball, who acquired Russian War Prisoner from Kallir in 1957, about his knowledge of the Work's provenance."[FN106]
Specifically, Respondent argues that "the People's September 27 Production did not include any material obtained from the Other Institutions which held works by Schiele seized by the People, nor any of the 'evidence' the People contended they relied upon in distinguishing the inquiry conducted by those Other Institutions from that conducted by AIC."[FN107]
Further, Respondent argues that the People's November 25 Production consisted "of more than 2,200 pages of material obtained from the Other Institutions who also possessed Schiele works sourced to Kornfeld and seized as part of this investigation [ . . . ] replete with information relevant to this investigation, [ . . . ] [including information that is] directly relevant to the issue of what constituted 'reasonable inquiry' for a museum or gallery in the 1950s and 60s."[FN108]

The People responded in opposition to Respondent's claims, arguing that (i) the vast majority of the materials provided after September 27, 2024 were not required to be turned over, with the exception of a few specific documents that were omitted due to human error, (ii) Respondent has failed to demonstrate any true prejudice as a result of the delayed disclosure and (iii) Respondent's argument is rendered moot as the Court has now provided Respondent with several months to review the belated disclosures and file any additional motions they deemed appropriate.[FN109]

"When material or information is discoverable under [CPL § 245.20] but is disclosed belatedly, the court shall impose a remedy or sanction that is appropriate and proportionate to the prejudice suffered by the party entitled to disclosure. Regardless of a showing of prejudice the party entitled to disclosure shall be given reasonable time to prepare and respond to the new material." CPL § 245.80(1)(a). When determining the appropriate remedy to be granted, the legislature has granted trial Courts broad discretion to impose the appropriate remedies in [*38]response to the specific facts and circumstances of the case at issue. CPL § 245.80(2). For example, under the statute, the Court is permitted to (i) make a further order for discovery, (ii) grant a continuance, (iii) order that a hearing be reopened, (iv) order that a witness be called or recalled, (v) instruct the jury that it may draw an adverse inference regarding the non-compliance, (vi) preclude or strike a witness's testimony or a portion of a witness's testimony, (vii) admit or exclude evidence, (viii) order a mistrial, (ix) order the dismissal of all or some of the charges provided that, after considering all other remedies, dismissal is appropriate and proportionate to the prejudice suffered by the party entitled to disclosure, or (x) make such other order as it deems just under the circumstances. Id.
Here, upon receiving detailed briefings from each side regarding the alleged discovery violations (or alleged lack thereof), this Court granted Respondent a continuance to review the additional evidence disclosed by the People. The Court then granted both sides leave to submit further motion papers regarding the issue of alleged discovery violations. Upon receipt and review of the motions submitted by both parties, this Court determined that a majority of the materials disclosed to Respondent on or after September 27, 2024 did not constitute materials "directly relate[d] to the subject matter" of this proceeding pursuant to CPL § 245.20. However, through their motion papers, the People conceded that, due to human error, a few documents directly related to the subject matter of this proceeding were belatedly disclosed. Therefore, pursuant to CPL § 245.80(1)(a), this Court offered Respondent a continuance to file additional motions directly related to evidence that was provided on or after September 27, 2024 and further offered the parties the opportunity to present additional oral arguments directly related to evidence that was provided on or after September 27, 2024. Respondent respectfully declined further oral argument on the matter and instead, requested that the Court consider the additional substantive arguments put forth in Respondent's discovery motions. The Court agreed. Given this arrangement, the Court sees no need for any further remedy or sanction.
Respondent's Request for a Hearing on the Merits
There is one, final matter to address: the Respondent's request for an evidentiary hearing. It should be noted that, as part of the proceedings in this case, this Court has reviewed voluminous filings and records, including but not limited to: original records detailing the voluntary leasing of Russian War Prisoner for public display, records detailing the involuntary cataloging and storage of Russian War Prisoner at Nazi-controlled facilities during the war, subsequent letters and invoices detailing the painting's sale and transport to New York City after the war, details surrounding subsequent sales, and national and international notices regarding the circulation of Nazi-looted art in the years following World War II. In addition, over the course of three Court appearances, this Court heard over ten hours of highly skilled and evidence-based oral argument from both sides. The Court has extensively reviewed and analyzed all the available materials and incorporated said materials into the Court's decision.
Holding a formal evidentiary hearing at this stage of the proceedings would serve no purpose. All relevant witnesses who could provide first-hand knowledge of the events have passed away. All pertinent evidence known to both parties was submitted to this Court as exhibits attached to the filings. Therefore, Respondent's motion for a further evidentiary hearing on the matter is denied.
Conclusion
This Court is acutely aware of the immense impact that this decision will have on the heirs of Fritz Grünbaum, on esteemed art institutions such as the Art Institute of Chicago, and on other, similarly-interested parties. Holocaust victims, survivors, and their heirs have a vested interest in reclaiming heirlooms that were wrongfully taken from their families during a war designed to exterminate not only their people, but also their history and their culture. The Art Institute of Chicago has a demonstrated interest in preserving artworks they have obtained through years of thoughtful education, research, and acquisition, as well as their laudable interest in exhibiting these treasures for the benefit of the general public. These two worthwhile interests have now come into conflict as a result of one of the greatest atrocities in modern history. In re Grand Jury Subpoena Duces Tecum Served on Museum of Mod. Art, 93 NY2d at 742 (1999). This Court cannot, and will not, erase the horrors of the past. Instead, the Court endeavors to pave a pathway for reasonable, equitable, and just resolutions of similar disputes.
For the reasons stated herein, the People's application for a turnover order is granted. This Court orders that Russian War Prisoner be relinquished to the legal heirs of its last legitimate owner, Fritz Grünbaum.
The foregoing constitutes the Decision and Order of the Court.
Dated: April 23, 2025
New York, New York
Althea E.M. Drysdale, A.J.S.C.

Footnotes

Footnote 1: This application originates from a larger investigation into eleven Egon Schiele artworks originating from Fritz Grünbaum's collection. Each of the artworks had at one point been possessed, displayed, offered or sold in New York County after World War II. To date, nine of the drawings have been returned on consent to Grünbaum's lawful heirs from the private collection of Ronald Lauder, the Museum of Modern Art (two drawings), the Santa Barbara Museum of Art, the Morgan Library and Museum, the private collection of Michael Lesh, the Carnegie Museums of Pittsburgh, and Oberlin College and Conservatory. The tenth drawing was returned as part of a private agreement. The eleventh artwork, Russian War Prisoner, forms the basis of this application. 

Footnote 2: The following factual summary is drawn in part from the allegations put forth in both the People's Application for a Turnover Order and the Respondent's Motion in Opposition, which the Court assumes to be true for this decision. The Court also takes judicial notice of the hundreds of exhibits submitted by both parties and draws from these exhibits as well.

Footnote 3: Accidental Talmudist, "The Comedian of Dachau: Fritz Grünbaum" Published 13 October 2021. Available at: https://www.accidentaltalmudist.org/heroes/2021/10/13/the-comedian-of-dachau3/. Last Accessed: 22 April 2025.

Footnote 4: Abhorrently, SS Reich Leader Heinrich Himmler, a prominent member of the Nazi Party often referred to as the "architect of the Holocaust" was once quoted as stating, "We must kill all the Jews because if we don't . . . their grandchildren will ask for their property back." Mark I. Labaton, Restoring Lost Legacies Absent Statute of Limitations Defenses, the United States is a Favorable Venue for Nazi-Looted Art Claims, Even When the Art is Located Abroad, L.A. Law., June 2018, at 34.

Footnote 5: The Anschluss was the annexation of the Federal State of Austria into Nazi Germany on March 12, 1938. This marked the Nazi regime's first act of territorial expansion and a significant breach of the post-WWI international order.

Footnote 6: People's Application at p. 41, para. 41(b)(1).

Footnote 7: Id. 

Footnote 8: Manu propria is used at the end of typewritten or printed documents with no handwritten signature. It is typically found just after the name(s) of the person(s) who would have signed the document if it had not been printed or typewritten.

Footnote 9: Keislinger Inventory of Grünbaum Property, People's Application, Exhibit 53A (Original, German) and 53B (English Translation).

Footnote 10: Kristallnacht translates literally to "Crystal Night," and is also known as "the Night of Broken Glass" referencing the shards of broken glass that littered the streets after the windows of Jewish-owned stores, buildings, and synagogues were smashed by the Nazis. 

Footnote 11: Rochlitzer's partner and co-conspirator, Alexander Bayer, was a childhood friend and schoolmate of Heinrich Himmler, the primary architect of the Holocaust and the Reich Leader of the Schitzstaffel (informally known as the "SS"), the parliamentary organization responsible for enforcing Nazi Germany's radical policies. For a "legal fee," Rochlitzer and Bayer would offer to "help" wealthy Jewish residents of Austria and Germany, Fritz and Elisabeth Grünbaum among them, by promising to appeal to Heinrich Himmler himself on their client's behalf for either an immigration visa to flee the countries or for a change in status from "Jewish" to "Mischling" [Mixed] to denote mixed-Aryan ancestry. This scheme was uncovered by Himmler's staff in 1940, leading Bayer to be investigated by the Reich Bar Association; however, Himmler's connections to Bayer protracted the investigation, and he was subsequently disbarred by the Bavarian Law Tribunal for Lawyers in 1958. Before his death in March of 1945, Rochlitzer was tried by the Reich for defrauding the Nazi party by pocketing the money received from clients as opposed to properly reporting the money to the Reichsbank for use in the war efforts.

Footnote 12: Chillingly, Rochlitzer's bill contains a line item charging Lilly for their "cemetery fees," even though, as of June 1939, Fritz and Lilly were both still alive.

Footnote 13: Marie-Therese Arnbom & Christoph Wagner-Trenkwitz, Grüss Mich Gott! Fritz Grünbaum 1880-1941: Eine Biographie (Brandstätter Verlag, 2005).

Footnote 14: The Führermuseum, also referred to as The Linz Art Gallery, was an unrealized art museum commissioned by Adolf Hitler in his hometown of Linz, Austria. The museum planned to curate and display art that was either purchased, confiscated, or stolen by the Nazis throughout Europe during World War II.

Footnote 15: 2007 Deposition of Eberhard Kornfeld:
Q: I would like to draw your attention to page 15 number 1?
A: Yes.
Q: That is a picture called Dead City, is that correct?
A: Yes.
Q: It says that it is from the collection of Fritz Gru nbaum, is that correct?
A: Yes.
Q: So, in 1956, when you wrote this catalogue, you knew that this painting came from Fritz Gru nbaum, didn't you?
A: Based on the information in the catalogue raisonne of Otto Nirenstein [Kallir].
Q: It's a yes or no question, sir?
A: (Through Interpreter) Based on the information of Otto Nirenstein [Kallir], I printed what you see here.
Q: Did Otto Nirenstein [Kallir] tell you that items 1 through 53 all came from Fritz Gru nbaum?
A: (Through Interpreter) As far as the purchases of 1956 by Otto Kallir are concerned, he did not say where they were from. But Otto Kallir produced a catalogue in 1930 and what you see in this catalogue here is based upon the catalogue from 1930.
Q: Did you, Dr Kornfeld, ever have a conversation with Otto Kallir about the provenance of works numbers 1 through 53?
A: (Through Interpreter) No.
Q: You never asked him where they came from?
A: (Through Interpreter) We never spoke about it.

Footnote 16: Stephanie Cuba, Stop the Clock: The Case to Suspend the Statute of Limitations on Claims for Nazi-Looted Art, 17 Cardozo Arts & Ent. L.J. 447, 470 (1999).

Footnote 17: 141 Am. Jur. Trials 189 (Originally published in 2015), quoting Vineberg v. Bissonnette, 529 F. Supp. 2d 300 (D.R.I. 2007), judgment aff'd, 548 F.3d 50 (1st Cir. 2008).

Footnote 18: Donald S. Burris, Esq., "Keynote: Restoration of a Culture: A California Lawyer's Lengthy Quest to Restitute Nazi-Looted Art," 45 N.C. J. Int'l L. 277, 287, Spring 2020.

Footnote 19: Scott M. Caravello, "The Role of the Doctrine of Laches in Undermining the Holocaust Expropriated Art Recovery Act," 106 Va. L. Rev. 1769 at 1778, December 2020. (Internal citations omitted.)

Footnote 20: Cuba, supra Note 11, at 473—74. See also; Donald S. Burris, Esq., "Keynote: Restoration of a Culture: A California Lawyer's Lengthy Quest to Restitute Nazi-Looted Art," 45 N.C. J. Int'l L. 277, 287, Spring 2020.

Footnote 21: Elizabeth K. Pomeroy, "'Unlawfully Lost' Artwork from the Nazi Takeover: Redefining Forced Sales in the Holocaust Expropriated Art Recovery Act of 2016," 21 Wake Forest J. Bus. & Intell. Prop. L. 468, 474, (Summer 2021).

Footnote 22: Caravello, supra Note 14 at 1777. (Internal citations omitted.)

Footnote 23: Nancy H. Yeide, Patricia A. Teter-Schneider, "S. Lane Faison, Jr. and 'Art under the Shadow of the Swastika,'" Archives of American Art Journal, Vol. 47, No. 3/4 (2008), pp. 24-37.

Footnote 24: Id.

Footnote 25: Id.

Footnote 26: Id. 

Footnote 27: Cuba, supra Note 11 at 475.

Footnote 28: Id. 

Footnote 29: Declaration by the United States and Certain Others of the United Nations, Made at Their Respective Capitals, January 5, 1943, Department of State Bulletin, January 9, 1943. Available at https://maint.loc.gov/law/help/us-treaties/bevans/m-ust000003-0754.pdf.

Footnote 30: Id. 

Footnote 31: Id. 

Footnote 32: See People's Exhibit 107.

Footnote 33: See People's Exhibit 108.

Footnote 34: See People's Exhibit 109.

Footnote 35: Id. 

Footnote 36: Id. 

Footnote 37: Id. 

Footnote 38: See People's Exhibit 110.

Footnote 39: Id.

Footnote 40: Id. 

Footnote 41: Final Act of the Intergovernmental Conference on the Protection of Cultural Property in the Event of Armed Conflict, The Hague, 1954. Available at: https://unesdoc.unesco.org/ark:/48223/pf0000082464 (Last accessed February 3, 2025).

Footnote 42: United Nations Educational, Scientific and Cultural Organization ("UNESCO"): "About 1970 Convention." Available at: https://www.unesco.org/en/fight-illicit-trafficking/about. Last Accessed: 3 February 2025.

Footnote 43: Id. 

Footnote 44: United Nations General Assembly, 30th Session, 1975-1976. "Restitution of Works of Art to Countries Victims of Expropriation." Available at: https://digitallibrary.un.org/record/189355?ln=en&v=pdf. Last Accessed: 4 February 2025.

Footnote 45: Id. 

Footnote 46: International Council of Museums, Code of Ethics. Available at: https://icom.museum/en/resources/standards-guidelines/code-of-ethics/. Last Accessed: 21 March 2025.

Footnote 47: Id. 

Footnote 48: Id. 

Footnote 49: Association of Art Museum Directors, Report of the AAMD Task Force on the Spoilation of Art during the Nazi/World War II Era (1933-1945), Published 4 June 1998. Available at: https://www.obs-traffic.museum/sites/default/files/ressources/files/AAMD_report_spoliation.pdf. Last Accessed 4 February 2025.

Footnote 50: Id.

Footnote 51: Id. 

Footnote 52: Id. 

Footnote 53: Id. 

Footnote 54: Id. 

Footnote 55: Id. 

Footnote 56: United States Department of State, Office of the Special Envoy for Holocaust Issues, 1998 Washington Conference Principles on Nazi-Confiscated Art. Available at: https://www.state.gov/washington-conference-principles-on-nazi-confiscated-art/.

Footnote 57: Id.

Footnote 58: United States Congress S. 1564 — Holocaust Victims Redress Act, 105th Congress (1997-1998). Available at https://www.congress.gov/bill/105th-congress/senate-bill/1564. Last accessed 4 February 2025.

Footnote 59: American Association of Museums, Nancy H. Yeide, Amy Walsh, & Konstantin Akinsha, The AAM Guide to Provenance Research, American Association of Museums, 2001. ISBN 093120173X.

Footnote 60: American Association of Museums, Section on Ethics, Standards, and Professional Practices, Unlawful Appropriation of Objects During the Nazi Era. Available at: https://www.aam-us.org/programs/ethics-standards-and-professional-practices/unlawful-appropriation-of-objects-during-the-nazi-era/. Last Accessed 31 December 2024.

Footnote 61: Id.

Footnote 62: Id.

Footnote 63: Id. 

Footnote 64: Id. 

Footnote 65: Id. 

Footnote 66: Id. 

Footnote 67: Id. 

Footnote 68: Id. 

Footnote 69: Id. 

Footnote 70: Id. 

Footnote 71: Conference on Jewish Material Claims Against Germany and the World Jewish Restitution Organization, Nazi-Era Stolen Art and U.S. Museums: A Survey of U.S. Museums Concerning Adherence to the Washington Conference Principles on Nazi-Confiscated Art and the Procedures and Guidelines Recommended by the American Association of Museums Regarding Objects Transferred in Europe During the Nazi Era, July 25, 2006. Available at: https://art.claimscon.org/wp-content/uploads/2014/04/U.S.-Museum-Survey-report-07-25-06.pdf "Of the approximately 114 US museums that indicated in their response to the Claims Conference/WJRO questionnaire or substitute letter that they conduct provenance research, only 12 museums stated that they employ, will employ, or have previously employed a full-time researcher. These museums are the Art Institute of Chicago, [ . . . ]."

Footnote 72: Id. at p. 15.

Footnote 73: United States Department of State, Office of the Special Envoy for Holocaust Issues, 2009 Terezin Declaration on Holocaust Era Assets and Related Issues. Available at: https://www.state.gov/prague-holocaust-era-assets-conference-terezin-declaration/. 

Footnote 74: Id. 

Footnote 75: United States Congress, Holocaust Expropriated Art Recovery Act of 2016, Available at https://www.congress.gov/114/plaws/publ308/PLAW-114publ308.pdf. Last accessed 6 February 2025.

Footnote 76: Id.

Footnote 77: Id.

Footnote 78: Id.

Footnote 79: Id.

Footnote 80: United States Department of State, Office of the Special Envoy for Holocaust Issues, Best Practices for the Washington Conference Principles on Nazi-Confiscated Art, March 5, 2024. Available at: https://www.state.gov/best-practices-for-the-washington-conference-principles-on-nazi-confiscated-art/

Footnote 81: Id.

Footnote 82: Id. 

Footnote 83: The People assert that, "Of the 53 Schieles in Kornfeld's 1956 sale, at least 21 are from Grünbaum's pre-war collection: 3 oil paintings, 3 pencil drawings, 14 watercolor drawings and 1 etching. [ . . . ] Of the 15 pencil drawings included in the 1956 sale, 3 had previously been listed as part of Grünbaum's art collection and exhibited in the 1925 Würthle exhibition. Of the 34 color drawings included in the 1956 auction, 14 had previously been listed as part of Grünbaum's art collection and exhibited in either the 1925 or 1938 exhibitions." People's Application at p. 60, para. 58. 

Footnote 84: People's Application at p. 68, para. 66.

Footnote 85: See People's Exhibit 75A (Buomberger excerpts, original in German) at p. 47 and Exhibit 75B (English translation) at p. 2. 

Footnote 86: The Art Institute of Chicago, "Provenance Research". Available at: https://www.artic.edu/collection-information/provenance-research. Last Accessed: January 28, 2025.

Footnote 87: Id. (emphasis added).

Footnote 88: Id. (emphasis added).

Footnote 89: Id. 

Footnote 90: Id. 

Footnote 91: Respondent's Brief in Opposition at p. 11.

Footnote 92: American Association of Museums, Section on Ethics, Standards, and Professional Practices, Unlawful Appropriation of Objects During the Nazi Era, supra, Note 49.

Footnote 93: Id. 

Footnote 94: Art Institute of Chicago, "Committee on Prints and Drawings Meeting Minutes" dated July 21, 1966 at p. 104-05. ("Upon motion made, seconded and duly carries, it was voted to recommend the following purchases to the Committees on Buckingham Fund and Acquisitions: [ . . . ] From the Maurice D. Galleher Fund Income: (see note below) Egon Schiele, Austrian, 1890-1918, "Russian War Prisoner," pencil with watercolor B.C. Holland $5,500" (Note: After this meeting, Dr. E. A. Solow donated $2750 for this drawing by Schiele, the balance of $2750 to be paid by July 1, 1967.))

Footnote 95: See People's Exhibit 118 (October 2002 updated AIC Provenance).

Footnote 96: American Association of Museums, Section on Ethics, Standards, and Professional Practices, Unlawful Appropriation of Objects During the Nazi Era, supra, Note 46.

Footnote 97: Id. 

Footnote 98: October 2002 updated AIC Provenance, supra Note 95.

Footnote 99: People's Application at p. 115, para. 104.

Footnote 100: Id. at para 105.

Footnote 101: Id. at para. 106.

Footnote 102: Id. at para. 108(d).

Footnote 103: Respondent's Brief in Opposition at p. 96.

Footnote 104: Respondent's Memorandum of Law in Reply and Opposition to the People's Discovery Response and Demand, dated December 31, 2024 at p. 1.

Footnote 105: Id. at p. 5.

Footnote 106: Id. at p. 6. 

Footnote 107: Id. 

Footnote 108: Id. 

Footnote 109: People's Reply to Motion and Demand dated January 14, 2025 at p. 2, ¶ 3.